**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE: GROUPON DERIVATIVE LITIGATION | Master Docket No. 12 C 5300 |
| | Judge Joan H. Lefkow |

## VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, by their undersigned counsel, derivatively on behalf of Groupon, Inc. ("Groupon" or the "Company"), allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon their counsel's investigation, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available materials regarding Groupon, as follows:

## NATURE OF THE DERIVATIVE ACTION

1. This is a shareholder derivative action brought on behalf of Nominal Defendant Groupon against Andrew D. Mason, Eric P. Lefkofsky, Bradley A. Keywell, Peter J. Barris, Theodore J. Leonsis, Howard Schultz, Kevin J. Efrusy and Mellody Hobson, all of whom are present or former officers and/or directors of Groupon (collectively, "Director Defendants").

2. Plaintiffs, derivatively on behalf of Groupon, seek relief for the damages sustained and to be sustained by the Company as a result of the Director Defendants' breaches of fiduciary duties owed to the Company.

3. Founded in 2008, Groupon is an internet commerce company engaged in the direct marketing of discounts on goods and services to customers primarily via email and the internet.

4.     Beginning in 2009, Groupon embarked on a period of unprecedented growth.  It quickly expanded to 45 countries and grew its employee base from approximately 37 to over 9500.  Unfortunately for Groupon and its shareholders, the Company could not keep pace with its rate of growth and, as a result, its internal controls suffered.

5.     In June 2011, Groupon announced it planned to go public.  Groupon's journey to becoming a public company, however, was a rocky one.  Between its first Form S-1 Registration Statement (the "Registration Statement") filed with the SEC on June 2, 2011, and the Initial Public Offering ("IPO") on November 4, 2011, the SEC forced the Company to file multiple amendments to the Registration Statement because of, among other things, material misstatements in the offering documents concerning the Company's finances and its use of improper and misleading accounting methodologies and metrics.

6.     Specifically, as set forth below, the SEC found that the Company's use of non-GAAP accounting metrics rendered its financial statements misleading.  In addition, the SEC questioned Groupon's ability to adequately reserve for returns, an issue that would later force Groupon to revise its first financial statement as a public company.

7.     Each of the Director Defendants sat on Groupon's Board of Directors throughout the IPO process and signed off on each of the amendments to the Company's Registration Statement.[1]

8.     Following the SEC's numerous inquiries and requests for clarification resulting in multiple amendments to its offering documents, on November 4, 2011, Groupon finally went public, selling 35 million shares at $20 per share.  The IPO produced net proceeds of $658 million.

---

[1] Defendant Mellody Hobson's election to the Groupon Board of Directors was announced on June 22, 2011.  She did not sign the initial Registration Statement, but did sign each of the amendments.

9. On February 8, 2012, Groupon reported its first set of financial results as a public company covering the fourth quarter and year ended December 31, 2011.

10. Less than two months later, on March 30, 2012, Groupon conceded it needed to downwardly revise those financial results, and admitted that senior management had identified "material weakness" in the Company's internal controls over financial reporting. Groupon further revealed a $14.3 million reduction in the Company's fourth quarter 2011 revenue and an increase to fourth quarter operating expenses, which reduced: (i) operating income by $30 million; (ii) net income by $22.6 million; and (iii) earnings per share by $0.04. The revisions were necessary because the Company used improper accounting practices and procedures to calculate the amount it needed to reserve for returns. Moreover, the Company admitted its controls over disclosures to investors were ineffective. As a result, Groupon's Annual Report on Form 10-K for year ended December 31, 2011 was forced to include a statement of a "material weakness" concerning its internal controls over its financial disclosures.

11. Reaction to the news was swift and severe. On the first trading day after the disclosures, the Company's stock dropped 17% ($3.10) to close at $15.28 per share. The SEC launched a preliminary investigation into Groupon's accounting problems. Shortly thereafter, multiple lawsuits were filed against the Company alleging securities fraud.

12. While the Director Defendants have attempted to downplay the damage and effect of the March 30, 2012 revisions and the concurrent announcement of material weakness in the Company's internal controls, the revelations were a huge blow to Groupon and its future prospects. As a result of the Director Defendants' misconduct, the Company has incurred a substantial loss of market capital; its business, goodwill, and reputation with its business partners, regulators and shareholders have been gravely impaired; and the Company's ability to

raise further capital in the debt or equity markets on favorable terms has been impaired. As of July 27, 2012, Groupon stock traded at $7.59 per share, 62% less than Groupon's initial offering price.

13.     The Director Defendants were all members of Groupon's Board of Directors while it was still a private company and were well aware of the Company's accounting and reporting deficiencies before the Company's IPO. Despite being on notice of the accounting deficiencies and weaknesses in internal controls, they utterly failed to properly implement, oversee and maintain sufficient internal controls, practices and procedures to ensure the Company's compliance with federal law and Generally Accepted Accounting Procedures ("GAAP"). As detailed below, the Director Defendants' malfeasance has substantially harmed the Company and they should be held accountable.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds the jurisdictional amount of $75,000, exclusive of interest and costs. In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

15.     Venue is proper in this Court because Groupon maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Director Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### Plaintiff

16.     Plaintiff Theresa Monturano ("Monturano") is a resident and citizen of Virginia and is an owner and holder of Groupon common stock.   Monturano has been a Groupon shareholder since November 2011.

17.     Plaintiff Kent Wong ("Wong") is a resident and citizen of Oregon.  He acquired his shares of Groupon common stock in the IPO.  At all times relevant hereto, Wong has been a Groupon shareholder.

### Nominal Defendant

18.     Nominal Defendant Groupon is a corporation, which maintains its executive offices at 600 West Chicago Avenue, Suite 620, Chicago, Illinois, and is incorporated under the laws of the State of Delaware.  Groupon is an e-commerce marketplace that connects merchants to consumers by offering goods and services at a discount in North America and internationally via internet and e-mail promotions.  The Company's predecessor, ThePoint.com ("The Point") was founded in 2007 as a collective action platform called and eventually changed its name to Groupon.  Groupon went public on November 4, 2011 and its stock trades on the NASDAQ exchange.

### Director Defendants

19.     The following parties, sometimes referred to herein as Director Defendants, served as members of the Board of Directors of Groupon. during the period from June 2011 through the present (the "Relevant Timeframe"), pursuant to a voting agreement by and among Groupon and the significant pre-IPO holders of the Company's preferred and common stock (the "Voting Agreement").

20.     Defendant Andrew D. Mason ("Mason") is a director and the Chief Executive Officer ("CEO") of the Company, and has served in those capacities since 2008.  Mason, along with Defendants Eric Lefkofsky and Bradley Keywell, co-founded Groupon in 2008.  Prior to co-founding Groupon, Mason was a software developer with InnerWorkings, Inc. ("InnerWorkings"), a company co-founded by Defendant Lefkofsky.  Mason was elected to the Board of Directors of Groupon pursuant to rights granted to the former holders of the Company's preferred and common stock under the Voting Agreement.  Defendant Mason is a citizen of Illinois.

21.     Defendant Eric P. Lefkofsky ("Lefkofsky") is a co-founder and a director of Groupon, and has served in that capacity since 2008.  He is the Executive Chairman of the Board of Directors.  Lefkofsky is a co-founder and director of InnerWorkings, Echo Global Logistics, Inc. ("Echo"), MediaBank, LLC ("MediaBank"), and Lightbank LLC ("Lightbank"), a managing partner of Lightbank and a director of BenchPrep.  Lefkofsky was the Chief Operating Officer and a director of HA-LO Industries Inc. ("HA-LO"), until the company filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in 2001.  Lefkofsky co-founded and served as the president of Starbelly.com, Inc. ("Starbelly"), until it was acquired by HA-LO. Lefkofsky was elected to the Board of Directors of Groupon pursuant to rights granted to the former holders of the Company's Series B preferred stock under the Voting Agreement. Defendant Lefkofsky is a citizen of Illinois.

22.     Defendant Bradley A. Keywell ("Keywell") is a co-founder of the Company and has served as a director of the Company since 2008.  He is a member of the Company's Compensation Committee and the Chair of the Nominating and Governance Committee. Keywell, along with Defendant Lefkofsky, is a co-founder and director of Echo, MediaBank and

Lightbank. He is also a managing partner of Lightbank, a director of BenchPrep and a co-founder of Starbelly. Keywell was a president at HA-LO, until the company filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code in 2001. Keywell was elected to the Board of Directors of Groupon pursuant to voting rights granted to the former holders of the Company's Series B preferred stock under the Voting Agreement. Defendant Keywell is a citizen of Illinois.

23. Defendant Peter J. Barris ("Barris") is a director of Groupon and has served in that capacity since 2008. He chairs the Company's Compensation Committee and is a member of the Nominating and Governance Committee. Barris serves as a member of the board of directors of Vonage Holdings Corp., Echo, MediaBank, BenchPrep and SnagFilms, Inc. ("SnagFilms"). He was also a member of the board of InnerWorkings until June 2012. Barris is the Managing General Partner of New Enterprise Associates (NEA), and has led NEA's investment in numerous companies run or managed by Defendants Lefkofsky and Keywell including Groupon, Echo, InnerWorkings and MediaBank. Additionally, both NEA and Lightbank are investors in BenchPrep. Under Barris's leadership, NEA provided $4.8 million in first round funding to Groupon's predecessor, The Point, and participated in a second round funding for Groupon in the aggregate amount of $30 million. Barris was elected to the Board of Directors of Groupon pursuant to voting rights granted to NEA under the Voting Agreement. Defendant Barris is a citizen of Illinois.

24. Defendant Theodore J. Leonsis ("Leonsis") is a director of Groupon and has served in that capacity since 2009. He is the Vice Chairman of the Board of Directors, Chairman of the Audit Committee and a member of the Compensation Committee. Leonsis serves as a member of the board of directors of AOL LLC (Vice Chairman Emeritus), American Express

Co., Rosetta Stone Ltd., and several private internet and technology companies, including, without limitation, MediaBank and SnagFilms (founder and Chairman). Leonsis is also the Chairman and CEO of Monumental Sports & Entertainment, a sports and entertainment company that owns the NBA's Washington Wizards, the NHL's Washington Capitals, the WNBA's Washington Mystics and the Verizon Center in Washington, D.C. Leonsis was elected to the Board of Directors of Groupon pursuant to voting rights granted to the former holders of the Company's preferred and common stock under the Voting Agreement. Defendant Leonsis is a citizen of Maryland.

25. Defendant Howard Schultz ("Schultz") was a director of Groupon since 2011 and a member of the Company's Audit Committee until he resigned from the Board of Directors effective April 24, 2012. Schultz is the Chairman, President and CEO of Starbucks Corporation ("Starbucks"). Schultz is a co-founder of venture capital firm Maveron LLC ("Maveron"). In February 2011, Schultz and several affiliated partnerships of Maveron invested $15 million in Groupon. Schultz was elected to the Board of Directors of Groupon pursuant to voting rights granted to the former holders of the Company's preferred and common stock under the Voting Agreement. Defendant Schultz is a citizen of Washington.

26. Defendant Kevin J. Efrusy ("Efrusy") was a director of Groupon from 2009 through June 19, 2012, and during that time served as a member of the Company's Audit and Compensation Committees. Efrusy serves as a member of the board of directors of several private consumer internet service and SaaS/open source software companies. Efrusy is the General Partner of Accel Partners. In 2009, Accel led the $30 million second round funding for Groupon. Efrusy was elected to the Board of Directors of Groupon pursuant to voting rights granted to affiliated Accel entities, Accel Growth Fund L.P. (Accel Partners and Accel Growth

Fund L.P. are collectively referred to as "Accel"), under the Voting Agreement. Defendant Efrusy is a citizen of California.

27.     Defendant Mellody Hobson ("Hobson") is a director of Groupon and has served in that capacity since June 2011. She is a member of the Company's Compensation and Nominating and Governance Committees. Hobson is the President and Chairperson of Ariel Investments, LLC ("Ariel"). She also serves as a member of the board of directors of Starbucks, DreamWorks Animation SKG, Inc. and The Estee Lauder Companies Inc. Hobson was elected to the Board of Directors of Groupon pursuant to voting rights granted to the former holders of the Company's Series B preferred stock under the Voting Agreement. Defendant Hobson is a citizen of Illinois.

## RELEVANT NON-PARTIES

28.     Jason E. Child ("Child") has served as Chief Financial Officer ("CFO") of Groupon since 2010. From 1999 through 2010, Child was employed by Amazon.com, Inc. ("Amazon"). During the period from April 2007 until December 2010, Child was the Vice President of Finance, International, at Amazon. Prior to joining Amazon, Child spent more than seven years as a C.P.A. and consulting manager at Arthur Andersen.

29.     Joseph M. Del Preto II ("Del Preto") has served as the Chief Accounting Officer of Groupon since 2011. From 2009 to 2010, Del Preto was the Controller and Vice President, Finance, of Echo. Prior to joining Echo, Del Preto was the Controller of InnerWorkings.

## DIRECTOR DEFENDANTS' DUTIES AND BREACHES THEREOF

30.     By reason of their positions as officers, directors and fiduciaries of Groupon, as well as their ability to control the business, corporate and financial affairs of the Company, each of the Director Defendants owed the Company and its shareholders fiduciary obligations of loyalty and candor and were and are required to use their utmost ability to control and manage

the Company in a fair, honest and equitable manner. Moreover, each of the Director Defendants owed the Company and its shareholders fiduciary obligations of good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

31. The Director Defendants were and are required to ensure that Groupon operated in compliance with all applicable federal and state laws, rules and regulations, and that the Company was not engaged in any unsafe, unsound or illegal business practices. Additionally, they were and are required to act in furtherance of the best interests of Groupon and its shareholders so as to benefit all shareholders equally, and not in furtherance of Director Defendants' personal interests or benefit.

32. The Director Defendants, because of their positions of control and authority as directors and/or officers of Groupon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Groupon, each of the Director Defendants had knowledge of material non-public information regarding the Company.

33. To discharge their duties, Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of Groupon. By virtue of this obligation of ordinary care and diligence, the Director Defendants were required, among other things, to:

      a. Manage, conduct, supervise and direct the employees, businesses and affairs of Groupon, in accordance with laws, rules and regulations, and the charter and by-laws of Groupon;

b.      Neither violate nor knowingly or recklessly permit any officer, director or employee of Groupon to violate applicable laws, rules and regulations and to exercise reasonable control and supervision over such officers and employees; ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Groupon;

c.      Remain informed as to how Groupon was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of financial controls to gather and report information internally, to allow the Director Defendants to perform their oversight function properly to prevent the use of non-public corporate information for personal profit;

d.      Supervise the preparation, filing and/or dissemination of any SEC filings, press releases, audits, reports or other information disseminated by Groupon and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of Groupon and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

e.      Preserve and enhance the Company's reputation as befits a public corporation and to maintain public trust and confidence in Groupon as a prudently managed entity fully capable of meeting its duties and obligations.

34.     In addition, according to the Charter of the Audit Committee, defendants Efrusy, Leonsis and Schultz, as members of the Audit Committee, were and are responsible for, among other things:

a.     Discussing with management and the independent auditors the adequacy and effectiveness of accounting and financial controls, including the Company's system to monitor and manage business risk and legal and ethical compliance policies;

b.     Reviewing with management and the independent auditors the Company's quarterly and annual financial statements, including judgments regarding the quality (not just the acceptability) of accounting principles and policies, the reasonableness of significant judgments and the clarity of the disclosures in the financial statements;

c.     Establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

d.     Reviewing with management the Company's earnings press releases (including any use of pro forma or other non-GAAP information) prior to the issuance of any such press release;

e.     Discussing with management and the independent auditors, as appropriate, any correspondence with regulators and governmental agencies and any employee complaints or reports that raise material issues regarding the Company's financial statements, accounting policies or internal controls;

f.      Discussing with management and the independent auditors significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements; and

g.      Taking appropriate actions to set the overall corporate "tone" for quality financial reporting, sound business risk practices and ethical behavior.

35.     Director Defendants breached their duties of loyalty, candor and good faith by failing to implement the required accounting and reporting controls and procedures, causing Groupon to operate with material weakness in its financial controls and misrepresent its financial condition, as detailed herein.  The Company is now the subject of numerous lawsuits, as well as an SEC investigation.

36.     As a result of Director Defendants' breaches of their fiduciary obligations to the Company and its shareholders, Groupon has suffered irreparable damage to its corporate image and goodwill.

## SUBSTANTIVE ALLEGATIONS

### Background

37.     Groupon is an e-commerce local marketplace, which connects merchants to consumers by offering goods and services at a discount in North America and internationally. The Company conducts business with a wide variety of businesses including those involved in the sale of food and drink, activities, health and beauty, events, services and retail.  Groupon sends daily e-mails to its subscribers offering discounts for good and services, which are targeted to the subscriber's location and personal preferences.  Consumers also may access the deals through the Groupon website and mobile application.

38.     Groupon was Mason's brainchild.  He created the site as a way for internet users to source support for collective action campaigns, such as boycotts forcing cell phone companies

to change contract provisions or raising money to build a neighborhood park. Each campaign would be triggered only after it reached a pre-set tipping point of resources, such as volunteer labor or cash donations. If the minimum level of resources committed had not been achieved by a pre-set date, the proposed campaign would expire and everyone who had pledged to contribute would be released from their commitment.

39. Mason pitched the idea for the website, initially called The Point, to Lefkofsky while he was working as a software developer at one of Lefkofsky's companies, InnerWorkings.

40. Liking the concept, Lefkofsky decided to invest in The Point and brought his long time friend and business partner, Keywell, into the deal as well. The Point was incorporated in 2007, with Lefkofsky, Mason and Keywell as its founders.

41. From the early days (when Groupon was still known as The Point), Lefkofsky, Mason and Keywell were intricately involved in the Company's affairs. In fact, Groupon's headquarters are housed in the same building as Lefkofsky's and Keywell's other businesses in Chicago.

42. From the start, Lefkofsky was deeply involved in implementing Groupon's business strategy, while Mason was responsible for the Company's day to day operations. FRANK SENNETT, GROUPON'S BIGGEST DEAL EVER, 40 (St. Martins Press) (2012).

43. Groupon's founders were intent on making The Point a revenue generating business as quickly as possible. To that end, they shifted the Company's focus from collective action and focused on the ***collective buying*** concept behind what is now known as Groupon: every day, the site would highlight deals at various businesses with a discounted price. The deal incentivized consumers to purchase by offering deep discounts on the goods and/or services they bought. Groupon also appealed to merchants by applying the logic of tipping points: the

14

Company guaranteed the merchants a minimum number of participants, or else the deal would not occur. In October 2008, the first Groupon was launched.

44. Lefkofsky, Mason and Keywell sought out venture capital firms to invest in the Point and found a willing participant in NEA. In addition, NEA's Managing General Partner, Barris, joined the Board of Directors.

45. This was not the first time Barris had worked with Lefkofsky and Keywell. Groupon was the third business venture between Barris and Lefkofsky and the second between Barris and Keywell. As *The Wall Street Journal* reported, Barris, through his venture capital firm, NEA, invested $40 million in InnerWorkings, a print management company based in Chicago that Lefkofsky co-founded. Both Barris and Lefkofsky served on the board of InnerWorkings. In June 2006, NEA invested $13 million dollars in Echo, a Chicago-based provider of shipping services to businesses. In 2009, Barris joined Lefkofsky and Keywell on the board of Echo. *See* Russ Garland, *Groupon Founders, NEA Teamed Up Before,* Wall St. J., Nov. 4, 2011, at http://blogs.wsj.com/venturecapital/2011/11/04/groupon-founders-nea-teamed-up-several-times-before/.

46. In 2007, Barris, through NEA, also backed MediaBank, a Chicago advertising procurement and analytics company co-founded by Keywell and Lefkofsky. Barris also joined MediaBank's board in 2007. In 2010, "Lefkofsky and Keywell set up Lightbank to handle their investment activities and ***sure enough–NEA has shown up as a partner in three of its investments***: Poggled, a nightlife deals and recommendation site; Sprout Social, which helps businesses manage interactions with customers on social media; and BeachMint, a collection of social commerce sites." *Id.* (emphasis added).

47.     A November 7, 2011, *Fortune* article entitled "NEA: The VC World's Best-Kept Secret," also discussed NEA's early investment in Groupon's predecessor company in 2008, and Barris' involvement in the Company, noting that "NEA cut a $4.8 million check [ ] and got to work helping shape the business." Barris was quoted in the article as saying:

> Once that [collective buying] model got traction, I became a pain in the ass, pushing [CEO] Andrew Mason to grow quickly. I told them they should be expanding to four cities a month, which they did. Until they began expanding to 10.

Dan Primack, *NEA: The VC World's Best-Kept Secret*, Fortune, Nov. 7, 2011, at http://finance.fortune.cnn.com/2011/11/07/nea-groupon-venture-capital/.

48.     The *Fortune* article noted that Groupon raised nearly $700 million in its IPO and closed its first day of trading at a valuation of nearly $17 billion. "***That represents a massive return for NEA, which invested just $14.8 million for a 14.6% ownership stake and already has received $75 million via a dividend and private share sale***. …" *Id.* (emphasis added).

49.     Prior to the IPO, Groupon expanded at breakneck speed. By the end of 2009, ***just over a year after the first Groupon offer was posted***, the Company had launched in over thirty U.S. cities.

50.     According to a November 3, 2011 article published by Money Morning, "*The Rush to Debut Groupon IPO Is One More Reason to Avoid this Tech Trap*," Groupon subscribers grew to 142 million by the end of 2011's third quarter - a 93,321% increase from 152,000 in mid-2009. The Company sold 28.1 million coupons in just the first quarter of 2011, compared to 30.3 million in all of 2010. *See* Kerri Shannon, *The Rush to Debut Groupon IPO Is One More Reason to Avoid this Tech Trap,* Money Morning, Nov. 3, 2011, at http://moneymorning.com/2011/11/03/the-rush-to-debut-groupon-ipo-is-one-more-reason-to-avoid-this-tech-trap/.

51.     As the Company expanded, it continued to raise capital from private equity sources.   Rather than use this money to reinvest in the nascent Company, the Director Defendants instead used the opportunity to cash themselves out.   In fact, between 2010 and 2011, Groupon raised $1.081 billion from third-party investors (or $1.077 billion, net of issuance costs), yet retained only $147.4 million of the proceeds for working capital and general corporate purposes.   The remaining $929.7 million was used to cash out Lefkofsky, Keywell, Mason, Barris, Efrusy, Leonis and other insiders, as follows:

        a.     Defendant Mason received a payment of $27,931,440 for the redemption of 7,965,512 shares of Groupon voting common stock;

        b.     600 West Groupon LLC ("600 West Groupon"), managed by Defendant Lefkofsky and his wife, received a payment of $71,601,252 for the redemption of 11,538,120 shares of Groupon voting common stock;

        c.     Green Media, LLC ("Green Media") also owned by Lefkofsky and his wife, received a payment of $314,577,538 for the redemption of 53,935,792 shares of Groupon voting common stock;

        d.     Rugger Ventures LLC ("Rugger"), which is owned by Defendant Keywell's wife and children, received a payment of $156,641,294 for the redemption of 25,568,288 shares of Groupon voting common stock;

        e.     Entities affiliated with Accel Partners, where Defendant Efrusy is a managing partner, received a payment of $19,999,976 for the redemption of 2,532,444 shares of Groupon Series E preferred stock;

f.      Entities affiliated with Defendant Barris' venture capital firm, NEA, received a payment of $70,006,030 for the redemption of 3,622,524 shares of Groupon Series D preferred stock and 809,640 shares of Groupon Series E preferred stock;

g.      Defendant Leonsis received a payment of $208,491 for the redemption of 77,892 shares of Groupon non-voting common stock;

h.      Former Groupon director John R. Walter received a payment of $23,832,497 for the redemption of 3,823,232 shares of Groupon voting common stock; and

i.      Former Groupon director Jason Fried received a payment of $557,721 for the redemption of 70,620 shares of Groupon non-voting common stock.

**Groupon's Bumpy Road To Its Initial Public Offering**

52.     In June 2011, Groupon announced its intent to go public.  The initial Registration Statement was signed by each of the Director Defendants, except Hobson.

53.     Though the Company planned to launch its IPO in early September 2011, a series of major missteps by the Director Defendants stalled the IPO until November 2011.  Remarkably, Groupon's SEC filings revealed numerous accounting deficiencies that required no less than eight amendments to the Registration Statement.  Each of the amended Registration Statements was signed by all of the Director Defendants.

54.     Groupon first came under fire for including in its Registration Statement, an unorthodox, non-GAAP accounting metric referred to as "adjusted consolidated segment operating income" or "ACSOI."  Critics referred to this practice as "earnings before everything" because Groupon's use of ACSOI allowed the Company to exclude substantial expenses, including its hefty marketing expenses and costs for acquiring new subscribers, in order to report

positive operating income, when in reality, the Company was operating at a loss and **had never shown a profit**.

55.     Investors and the SEC were sharply critical of the Company's use of ACSOI, finding it to be a highly misleading accounting metric.  In fact, the SEC went so far as to instruct Groupon to remove the ACSOI metric from its filings before it would allow the Company to sell its shares to the public.

56.     The Company's exclusion of ACSOI consequently had a huge impact on the Company's operating income.  Utilizing ACSOI, the Groupon reported operating income of $60.6 million for 2010 and $81.6 million for the first quarter of 2011.  In the amended filings, which removed ACSOI, Groupon reported a $420 million **operating loss** for 2010 and a $117 million **operating loss** for the first quarter of 2011.

57.     Even Defendant Mason later admitted that the Company's use of the ACSOI accounting metric was suspect.  He was quoted as saying "nobody [at Groupon] anticipated that ACSOI would be a problem. Looking at it now, I can completely understand why people would be skeptical."  Mason continued:

> The public has a healthy skepticism for companies that make up metrics just because there is a history of correlation between making up metrics and shady companies. So I guess looking at that it's like, "Okay, I can see." It was just my naiveté. I am surprised that other people, like our bankers, didn't say, "Hey, usually making up metrics doesn't work out so well."

SENNETT, GROUPON'S BIGGEST DEAL EVER at 222.

58.     The SEC also criticized Groupon's revenue recognition policies, finding that they violated GAAP.  Specifically, in the Registration Statement, Groupon booked as "revenue" all of the cash it collected on a particular coupon, including the portion that Groupon was obligated to pay to the merchant.  For example, if Groupon sold a coupon for $40 promising it would allow a

consumer to receive $80 in services from a merchant, Groupon recorded the entire $40 in revenue, even though it was obligated to remit 50% or more of the coupon proceeds to the merchant providing the goods and services.

59.     Accordingly, the SEC directed Groupon to revise its revenue figures in order to comply with GAAP.  In response, the Company filed yet another amendment to the Registration Statement on September 23, 2011.  This time the Company downwardly revised its revenues for the first half of 2011 from *$1.5 billion to $688 million*.  The enormity of the revision alarmed the public and raised concerns regarding whether the Company would even complete the registration process.

60.     That same day, the *New York Times* published an article reacting to the nearly $900 million revenue revision, stating, in pertinent part:

> Groupon disclosed a major accounting change on Friday, essentially halving its once-jaw-dropping revenue after it encountered resistance from regulators with its filing to go public.
>
> Groupon, the online coupon titan, announced separately that its chief operating officer of about five months, Margo Georgiadis, had stepped down.
>
> The changes in the revised filing and the executive departure are likely to spur additional questions about Groupon, a much-envied rising star in the constellation of new Internet companies. The company has grown rapidly, but its ability to sustain that growth, the ways it measures growth and the eccentric public persona of its chief executive have come under fire at times.
>
> Despite those criticisms, and the current turmoil in the stock market, Groupon is still aiming to go public next month, people briefed on the matter have said. That offering could value Groupon at more than $15 billion.

Michael J. De La Merced & Evelyn M. Rusli, *Accounting Change Cuts Groupon's Revenue*, N.Y. Times Dealbook, Sept. 23, 2011, at http://dealbook.nytimes.com/2011/09/23/Groupon-Changes-Its-Revenue-Accounting/.

61.     The "Groupon Promise" also raised red flags for the SEC during the IPO process. The Groupon Promise is the Company's no questions asked return policy. As described by the Company, the policy works as follows:

> We're confident in the businesses we feature on Groupon and back them with the Groupon Promise. If the experience using your Groupon ever lets you down, we'll make it right or return your purchase. Simple as that.
>
> If you're ever having trouble redeeming your Groupon, we're here to help. If a business closes permanently, we will always honor returns for unredeemed Groupons. Unless a deal's Fine Print states otherwise, any unredeemed, unprinted Groupon may be returned within the first seven days after purchase. In other cases where a Groupon is not redeemed, returns are evaluated on a case-by-case basis. After the expiration date on a Groupon, it should still be used at the business for the amount paid, which never expires.

Groupon, Inc. *The Groupon Promise*, at http://www.groupon.com/groupon-promise.

62.     As Defendant Mason explained, "[ ] we have a completely open return policy, giving customers a refund if they ever feel like Groupon let them down. We do these things to make our customers and merchants happy, knowing that market success would be a side effect." Sennett, GROUPON'S BIGGEST DEAL EVER at 211.

63.     When reviewing the Company's financial statements, the SEC questioned how Groupon could adequately estimate refunds given this policy. Specifically, in its June 29, 2011 letter to Defendant Mason, the SEC stated, "[i]t appears that the 'Groupon Promise' is unconditional. In light of your rapid growth and entry into new markets, explain to us why you believe the amount of future refunds is reasonably estimable." Letter from SEC to Mason, June 29, 2011 at 11.

64.     The Company, however, was unable to allay the SEC's concerns and once again amended its Registration Statement on September 23, 2011. In this amendment, the Company set forth its critical accounting policy concerning refunds as follows:

> At the time of sale, we record an allowance for estimated customer refunds primarily based on historical experience. We accrue costs associated with refunds in accrued expenses on the consolidated balance sheets. The cost of refunds where the amount payable to the merchant is recovered is recorded in the consolidated statements of operations as a reduction to revenue. The cost of refunds under the Groupon Promise, when there is no amount recovered from the merchant, are presented as a cost of revenue. To the extent the refund is provided to a subscriber, we record the expense within selling general and administrative expense in the consolidated statements of operations. If our judgments regarding estimated customer refunds are inaccurate, reported results of operations could differ from the amount we previously accrued.

Groupon, Inc. Registration Statement, Sept. 23, 2011, http://www.sec.gov/archieves/edgar/data/1490281/000104746911008207/a220523825-1a.htm.

65.     Groupon's IPO filings also raised red flags regarding the lack of adequate internal controls over its financial reporting.  The November 3, 2011 prospectus (filed with the SEC on November 7, 2011) (the "Prospectus") stated that Groupon completed 20 acquisitions in a little over one year, expanded to 45 countries, increased the number of its participating merchants from 212 to 78,649, and expanded its employee base from 37 to 10,418 in the span of only two years.  Groupon's exponential growth in just over two years rendered it virtually impossible to implement the necessary internal controls.

66.     In fact, in an April 4, 2011, interview with *Forbes*, Defendant Lefkofsky readily admitted that he did not have enough senior level executives to oversee Groupon.  Specifically when asked how much time he spent at Groupon, Lefkofsky responded:

> It is still part of my daily life. The growth is so extreme that it requires me spending a significant amount of time on the business. Right now, I am helping out on a bunch of legal counsel (The company has no general counsel). ***No one expected, no one could have foreseen, that the revenue growth could be so extreme. You can't staff at senior level with this type of growth.***

Luisa Kroll, *New Billionaire Eric Lefkofsky Talks About Groupon and Tech Investing,* Forbes, Apr. 4, 2011, at http://www.forbes.com/sites/luisakroll/2011/04/04/new-billionaire-eric-lefkofsky-talks-about-groupon-and-tech-investing/ (emphasis added).

67.　　To make matters worse, in its Registration Statement, Groupon admitted its finance and accounting staff were inexperienced.　Moreover, the Company made the following disclosure in the Prospectus evidencing both its professional immaturity and nascent management:

> **Our management team has a limited history of working together and may not be able to execute our business plan.**
>
> Our management team has worked together for only a limited period of time and has a limited track record of executing our business plan as a team. **We have recently filled a number of positions in our senior management and finance and accounting staff. Accordingly, certain key personnel have only recently assumed the duties and responsibilities they are now performing. In addition, certain of our executives have limited experience managing a large global business operation.** Accordingly, it is difficult to predict whether our management team, individually and collectively, will be effective in operating our business.
>
> **Our management team has limited experience managing a public company, and regulatory compliance may divert its attention from the day-to-day management of our business.**
>
> **The individuals who now constitute our management team have limited experience managing a publicly-traded company and limited experience complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage our transition to being a public company that will be subject to significant regulatory oversight and reporting obligations under the federal securities laws.** In particular, these new obligations will require substantial attention from our senior management and could divert their attention away from the day-to-day management of our business, which could materially and adversely impact our business operations.

Groupon, Inc., Prospectus, Nov. 7, 2011, http://sec.gov/Archives/edgar/data/1490281/ 000104746911009142/a2206165z424b4.htm, at 27 (emphasis added and in original).

68. Groupon also admitted in the Prospectus that it had to restate its previously issued Consolidated Statements of Operations for the prior three years in order to comply with GAAP at the direction of the SEC:

> The Company has restated its previously issued Consolidated Statements of Operations for the years ended December 31, 2008, 2009 and 2010 to correct for an error in its presentation of revenue.
>
> Most significantly, the Company restated its reporting of revenues from Groupons to be net of the amounts related to merchant fees. Historically, the Company has reported the gross amounts billed to its subscribers as revenue. All prior periods have been restated to show the net amount the Company retains after paying the merchant fees. The effect of the correction resulted in a reduction of previously reported revenues and corresponding reductions in cost of revenue in those periods. The change in presentation had no effect on pre-tax loss, net loss or any per share amounts for any period presented.
>
> The Company has also changed the presentation of certain other income statement expenses to be consistent with reporting revenue on a net basis. These changes include presenting loyalty programs as a component of marketing rather than as an offset to revenue. The Company believes that this classification is most appropriate as it is acting as an agent on behalf of the merchant in driving traffic to generate revenue. In addition, refunds made to subscribers under the Groupon Promise are presented as a component of cost of revenue, rather than as an offset to revenue, as these amounts are not paid directly to the merchants.
>
> ***
>
> The following tables summarize the corrections on each of the affected financial statement line items for each period presented (in thousands).

| | As Previously Reported[1] | | Restatement Adjustment | | As Restated | |
|---|---|---|---|---|---|---|
| **For the year ended December 31, 2008** | | | | | | |
| Revenue | $ | 94 | $ | (89 ) | $ | 5 |
| Cost of revenue | | 89 | | (1 ) | | 88 |
| Marketing | | 163 | | — | | 163 |
| Selling, general and administrative | | 1,474 | | (88 ) | | 1,386 |
| **For the year ended December 31, 2009** | | | | | | |
| Revenue | $ | 30,471 | $ | (15,931 ) | $ | 14,540 |
| Cost of revenue | | 19,542 | | (14,826 ) | | 4,716 |
| Marketing | | 4,548 | | 505 | | 5,053 |
| Selling, general and administrative | | 7,458 | | (1,610 ) | | 5,848 |
| **For the year ended December 31, 2010** | | | | | | |
| Revenue | $ | 713,365 | $ | (400,424 ) | $ | 312,941 |
| Cost of revenue | | 433,411 | | (390,515 ) | | 42,896 |
| Marketing | | 263,202 | | 27,367 | | 290,569 |
| Selling, general and administrative | | 233,913 | | (37,276 ) | | 196,637 |

_____

[1] Includes certain reclassifications to conform to the current presentation

*Id.* at F8-F9.

69.     Against this backdrop, each of the Director Defendants knew prior to the Company going public that (i) the Company's accounting practices were in violation of GAAP, (ii) it was unclear whether the Company could adequately reserve for returns, (iii) the Company had an inadequate number of senior level experienced executives to effectively manage the Company in light of its exponential growth, and (iv) the Company had an inexperienced finance and accounting staff.

70.     Despite all of these red flags raised regarding Groupon's accounting practices and internal controls, Director Defendants did not seek an opinion from its outside auditor about the Company's internal controls prior to going public.  Instead, as Groupon's outside auditor, Ernst & Young, pointed out:

> We were not engaged to perform an audit of the Company's internal control over financial reporting.  Our audits included consideration of internal control over financial reporting as a basis

25

> for designing audit procedures that are appropriate in the circumstances, but not for purposes of expressing an opinion on the effectiveness of the Company's internal control over financial reporting.

*Id.* at F-3.

## The Defendants' Prior Business Dealings Are Scrutinized Prior To The IPO

71.    Groupon's IPO process also increased public scrutiny of the Defendants.   The spotlight on Defendant Lefkofsky was especially harsh.

72.    For example, on June 10, 2011, *Fortune* published an article entitled, "The checkered past of Groupon's chairman," which investigated the prior business ventures of Defendants Lefkofsky and Keywell and identified a disturbing pattern among them.   The article stated, in relevant part,

> [ ] Groupon's IPO has brought an uncomfortable spotlight onto Lefkofsky. While some attention focuses on his ambitions as an investor in tech startups, others see a "spotty history" and draw parallels between the past and the present.   Lefkofsky's track record, reflecting failures and successes, bears certain hallmarks: rapid revenue growth accompanied by big losses, a penchant to sell stock early on, and lawsuits filed by investors, lenders or customers who feel they have been wronged.

Kevin Kelleher, *The checkered past of Groupon's chairman*, Fortune, June 10, 2011, at

http://tech.fortune.cnn.com/2011/06/10/groupon-eric-lefkofsky .

73.    The article noted that Lefkofsky and Keywell's first business venture, Brandon Apparel, was in Lefkofsky's own words, a "huge failure."   While the company saw fast growth, it was not fast enough to repay debts.   As a result, the company collapsed.   While the fact that the company failed was not particularly unusual, the number of lawsuits it sparked certainly was:

> The risk of failure is inherent to entrepreneurialism. But Brandon Apparel's tanking yielded a series of lawsuits. A lender, Johnson Bank, sued Lefkofsky and won a default judgment of $11 million. The former owner of Brandon reportedly sued the company, as did National Football League Properties and Major League Baseball

> Properties. The city of Columbus, Wisc., loaned Brandon $750,000
> to create jobs in the city, but the company closed the plant not long
> after getting the loan and the city was forced to write off the loan.
> "They basically bailed out of Columbus, and that seems to be their
> ongoing tactic," Columbus's city attorney said at the time.

*Id.*

74.     Defendants Lefkofsky and Keywell's experience with Starbelly was equally

problematic.  The two founded Starbelly in March 1999.  The Company sold promotional t-shirts

and coffee mugs.  As the *Fortune* article explained:

> In August 1999, Starbelly raised $8 million from Chase Capital
> and Flatiron Partners, a deal that valued it at $32 million -- even
> though the company was on track to post a $2.5 million loss on
> $183,000 in revenues during its first six months of operation. In
> January 2000, Ha-Lo Industries, a promotional products company
> with five decades of experience, bought Starbelly -- now ten
> months old -- for $240 million.

*Id.*  Much of the $240 million went directly to Lefkofsky and not long afterwards, HA-LO

declared bankruptcy.  Once again, a series of lawsuits followed.

75.     *Fortune* reported that even Lefkofsky's more successful ventures raised

eyebrows.  For example:

> [ ] InnerWorkings has two red flags that should concern Groupon
> investors. The first is InnerWorkings' follow-on stock offering. In
> January 2007, when its stock was trading at 82% above its IPO
> price, InnerWorkings filed to sell another 8 million shares, but this
> time 5 million of the shares were being sold by insiders, with most
> of the shares sold by entities owned by and affiliated with
> Lefkofsky and his family. It was an unusual move: Most
> companies wait until a 6-month lockup period expires before
> offering more shares.
>
> The other red flag for InnerWorkings involves a lawsuit filed by
> Sports Publishing LLC in 2008. Although the suit was withdrawn
> after InnerWorkings countersued, the complaint remains a bizarre
> read, accusing InnerWorkings and Lefkofsky of "racketeering" and
> "terrorist tactics." Sports Publishing hired InnerWorkings to
> publish some 300 sports-themed titles and claimed it somehow
> ended up owing $2.5 million to its vendor.

*Id.*

76.     The *Fortune* article noted that Lefkofsky continued to have embarrassing

missteps, now with respect to Groupon:

> Yet even after Lefkofsky's 18 years of experience as an entrepreneur, he still stumbled last week. After Bloomberg TV dug up some old dirt, Lefkofsky responded that Groupon would be "wildly profitable". Now Groupon may need to refile its prospectus to clarify that heady prediction.
>
> A new filing would also serve shareholders by clarifying Lefkofsky's role at Groupon. If nothing else, the Sports Publishing lawsuit reveals that Lefkofsky may have been far more involved with InnerWorkings than its SEC filings indicated. In Groupon's IPO filing, CEO Andrew Mason confessed he only created Groupon "to get Eric to stop bugging me." Groupon may be thriving because of Mason's management skills, but it's still not clear how much control Lefkofsky has over the company.
>
> That question should concern investors because Lefkofsky and his family have already cashed out $382 million from Groupon before the IPO filing. (Keywell and his family cashed out $156 million, Andrew Mason, $10 million).
>
> \*     \*     \*     \*
>
> He knows how to generate big revenue through even bigger losses, often to destructive effect. Lefkofsky summarizes his credo as "you might as well fail fast." And, apparently, cash out fast.
>
> That ethic may be fine in the world of private equity, where investors usually have enough net worth and sophistication to stomach such risk. But it's another matter entirely in the public markets, where middle class investors can be seduced by the allure of a hot tech IPO.
>
> \*     \*     \*     \*
>
> Groupon's IPO prospectus should raise several red flags in a sensible investor's mind. Factor in Lefkofsky's checkered past, and this IPO is waving more red flags than a May Day parade.

*Id.*

77.    In the wake of this public criticism of Groupon's founders, on August 25, 2011, Defendant Mason responded in a company-wide e-mail. The e-mail, while purportedly written "to improve employee morale and provide information to employees in response to erroneous media reports that brought into question the integrity of management and the Company's ability to continue as a growing concern," was logically perceived as an attempt to tamp down criticism of the Company on the eve of a public float of the stock. Letter from Winston & Strawn LLP to SEC, Sept. 2, 2011, at 2. Moreover, given that it was sent to thousands of employees via e-mail, Mason knew that it inevitably would leak to the public.

78.    When the SEC learned of the communication, it required Groupon to, among other things, (a) explain whether it constituted a violation of Section 5 of the Securities Act of 1933, as amended, and (b) include an unedited copy of the communication in the appendix to the Prospectus so that investors would understand its full context. Although the SEC required disclosure of the improper pre-float communication, it took no position as to its veracity.

79.    In a similar vein, as mentioned in the *Fortune* article, Defendant Lefkofsky extolled the Company's prospects on Bloomberg TV. In response to Lefkofsky's comment that Groupon is going to be "wildly profitable," the SEC again requested the Company's analysis of how the statement was "consistent with the disclosure in [the] prospectus about [its] financial condition and prospects." Letter from SEC to Mason, June 29, 2011 at 2. Groupon responded by adding a risk disclosure to the Prospectus cautioning prospective investors not to rely on the reported statement.

80.    Finally, in the November 3, 2011 Prospectus, Groupon priced the IPO at $20.00 per share. After Groupon went public, Lefkofsky, Mason and Keywell collectively held 57.8

percent of the Company's voting power, and, thus, will continue to exert significant influence over the affairs of the Company.  Indeed, the Prospectus provides as follows:

> Andrew D. Mason, our Chief Executive Officer, Eric P. Lefkofsky, our Executive Chairman, and Bradley A. Keywell, one of our directors (who we collectively refer to in this prospectus as our "founders"), founded Groupon in October 2008. …
>
> Working closely together since our inception, Messrs. Mason and Lefkofsky have had key roles in the management of our company. Mr. Mason serves as our Chief Executive Officer and Mr. Lefkofsky serves as the Executive Chairman of our Board of Directors. As Executive Chairman, Mr. Lefkofsky will continue to work actively with Mr. Mason and senior management concerning a broad range of operating and strategic issues.
>
> In addition, as a result of the concentration of our capital stock ownership with our founders, they will have significant influence over management and over all matters requiring stockholder approval, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets, for the foreseeable future. … As a result of this dual class structure, our founders will continue to be able to control all matters submitted to our stockholders for approval even though they own less than 50% of the outstanding shares of our common stock.

Prospectus at 97.

**Groupon Announces Its Financial Results for
Its First Reporting Period as a Public Company**

81.     On February 8, 2012, Groupon issued a press release containing its fourth quarter and full year 2011 financial results.  Groupon reported a net loss of $42.7 million or ($0.08) diluted earnings per share (EPS), and revenue of $506.5 million.  Additionally, for fiscal year 2011, the Company reported a net loss of $350.8 million, or ($0.97) diluted EPS and revenue of $1.6 billion. Groupon also issued first quarter 2012 guidance, which forecasted income between $15 million and $35 million with revenue between $510 million and $550 million.  Among other things, the February 8, 2012 press release stated:

Revenue increased 194% to $506.5 million in the fourth quarter 2011, compared to $172.2 million in the fourth quarter 2010. The unfavorable impact from year-over-year changes in foreign exchange rates throughout the quarter was $3.5 million. Gross billings, which reflects the gross amounts collected from customers for Groupons sold, excluding any applicable taxes and net of estimated refunds, increased 201% to $1.25 billion in the fourth quarter 2011, compared with $415.3 million in the fourth quarter 2010.

"Groupon had a strong fourth quarter and we finished 2011 having helped 250,000 local merchants across 47 countries grow their businesses while saving Groupon customers billions of dollars," said Andrew Mason, CEO and Co-Founder of Groupon. "We will continue to invest in new services and tools that help our merchant partners be more successful and drive local commerce around the world."

Groupon, Inc., Press Release (Feb. 8, 2012), http://sec.gov/Archives/edgar/data/1490281/ 000110465912007814/a12-4452_1ex99d1.htm.

82.     Following this disappointing news so soon after the IPO, the Company's stock fell to $21.17 per share.  It still, however, traded above the IPO price at this time only because Groupon's improper accounting practices and artificially inflated financial results had yet to be revealed.

83.     Following the poor earnings, on February 9, 2012, *CFO.com* published an article entitled "Groupon's Use of Non-GAAP Measures Questioned," which once again raised concerns about the Company's accounting practices, in particular, non-GAAP metrics that it purportedly clarified pre-IPO:

On Wednesday CFO Jason Child fielded Groupon's first earnings call since the company went public in November. The company reported a fourth-quarter net loss of eight cents per share, up from a loss of $1.08 per share the year before. Higher-than-expected overseas tax expenses were partly to blame for the loss.

While those income numbers missed analysts' expectations, ***the more important issue for some experts is Groupon's use of non-GAAP metrics. The way Groupon reports some of its numbers is***

*troubling, says Anthony Catanach Jr., associate accounting professor at Villanova University and co-writer of the "Grumpy Old Accounts" blog.*

One example: ***Groupon relies heavily on non-GAAP measures such as consolidated segment operating income and free-cash flow. In its fourth-quarter earnings report, the company also used a pro-forma loss-per-share that excluded what it spent on stock-based compensation. That metric reduced Groupon's loss to 2 cents per share from 8 cents per share.***

***Companies that use these measures are often "trying to convince you that their loss isn't as bad as it seems***," Catanach says, contrasting Groupon with Facebook, which included stock-based compensation in the earnings it reported in its recent S-1 filing.

***Catanach says it is also possible that Groupon is obscuring the quality of its cash flow by providing an aggregate cash-flow statement that lacks many of the details required in 10-Q and 10-K reports filed with the Securities and Exchange Commission. "One of the measures that it keeps touting is its improved free-cash flows and operating cash flows," says Catanach. But it remains unclear, based on the statement, "where that cash is coming from," he says. As a result of this omission, the company could be increasing its operating cash flows by stretching out payment terms with its vendors and thus spiking current liabilities, says Catanach.*** This is a concern because the nature of these liabilities could be crucial information for investors. ***If Groupon were increasing operating cash flows by slowing payments to merchants, for instance, it could be setting itself up for a fall.***

Marielle Segarra, *Groupon's Use of Non-GAAP Measures Questioned*, CFO.com, Feb. 9, 2012, at http://www3.cfo.com/article/2012/2/banking-capital-markets_groupon-earnings-net-loss-accounting (emphasis added).

84. As it turned out, the persistent concerns regarding Groupon's accounting practices were well founded.

**Major Accounting Issues and Weaknesses in**
**Internal Controls Are Revealed**

85.     On March 30, 2012, after the close of the market, Groupon issued a press release announcing revisions to the Company's financial results reported just six weeks earlier and admitting material weakness in the Company's financial controls.  Groupon included the revised financial results in its annual report on Form 10-K filed with the SEC that same day.

86.     According to the press release, revenue for the fourth quarter of 2011 was reduced by $14.3 million after initially reporting revenue of $506.5 million.  As a result, the Company's operating income decreased by $30 million, net income fell by $22.6 million, and EPS dropped by ($0.04).  The Company blamed the revisions on a shift in the fourth quarter deal mix and higher price point offers, which caused higher refund rates.  The press release provided, in pertinent part:

> *The revisions resulted in a reduction to fourth quarter 2011 revenue of $14.3 million. The revisions also resulted in an increase to fourth quarter operating expenses that reduced operating income by $30.0 million, net income by $22.6 million, and earnings per share by $0.04.* Financial results for prior periods, including as of and for the nine months ended September 30, 2011, were not affected by the revisions.

> *            *            *            *

> *The revisions are primarily related to an increase to the Company's refund reserve accrual to reflect a shift in the Company's fourth quarter deal mix and higher price point offers, which have higher refund rates. The revisions have an impact on both revenue and cost of revenue.* A more detailed explanation of the refund reserve is included in the Critical Accounting Policies and Estimates section of Groupon's Annual Report on Form 10-K for the year ended December 31, 2011, filed today with the Securities and Exchange Commission (SEC).

Groupon, Inc., *Groupon Announces Revised Fourth Quarter and Full Year 2011 Results, Confirms First Quarter Guidance*, Mar. 30, 2012, at http://investor.groupon.com/releasedetail. cfm?ReleaseID=660861 (emphasis added).

87.     Perhaps even more troubling than the revenue write-downs, was the disclosure that the Company discovered material weakness in its internal control systems the Company said were adequate during the registration process:

> ***In conjunction with the completion of the audit of Groupon's financial statements for the year ended December 31, 2011 by its independent auditor, Ernst & Young LLP, the Company included a statement of a material weakness in its internal controls over its financial statement close process in its Annual Report on Form 10-K for year ended December 31, 2011. The Company has been working for several months with another global accounting firm in preparation for reporting on the effectiveness of its internal controls by the end of 2012, as required following Groupon's initial public offering last year.*** The Company continues to implement process improvement initiatives and augment its staffing, and is expanding the accounting firm's engagement scope to address the underlying causes of the material weakness. Further discussion of the material weakness can be found in the Company's Form 10-K, filed today with the SEC.

*Id.* (emphasis added).

88.     The revenue revisions were further explained in Groupon's Form 10-K:

**Refunds**

At the time revenue is recorded, we record an allowance for estimated customer refunds. We accrue costs associated with refunds in accrued expenses on the consolidated balance sheets. The cost of refunds where the amount payable to the merchant is recoverable is recorded in the consolidated statements of operations as a reduction to revenue. The cost of refunds when there is no amount recoverable from the merchant are presented as a cost of revenue.

To determine the amount of our refund reserve, we track refund patterns of prior deals, use that data to build a model and apply that model to current deals. Further analysis of our refund activity into 2012 indicated deviations from modeled refund behavior for deals

> featured in late 2011, particularly due to a shift in our fourth
> quarter deal mix and higher price point offers. Accordingly, we
> updated our refund model to reflect changes in the deal mix and
> price point of our deals over time and we believe this updated
> model will enable us to more accurately track and anticipate refund
> behavior.

Groupon, Inc. Form 10-K for year ended December 31, 2011 (Mar. 30, 2012), at 56-57,

http://sec.gov/archives/edgar/data/1490281/000144530512000922/groupon10-k.htm.

89.     Upon information and belief, the Company's process for calculating refund

reserves prior to the revision constituted a violation of Financial Accounting Standards Board

("FASB") Financial Accounting Standard 48, which governs the manner a company can estimate

revenue for refundable products.  The FAS 48 Summary provides that:

> Revenue from those sales transactions shall be recognized at time
> of sale only if *all* of the conditions specified by the Statement are
> met. If those conditions are not met, revenue recognition is
> postponed; if they are met, sales revenue and cost of sales reported
> in the income statement shall be reduced to reflect estimated
> returns and expected costs or losses shall be accrued.

90.     Under FAS 48, Companies are allowed to set aside reserves against potential

refunds based on reasonable estimates.  Groupon, however, could not reasonably estimate its

refunds because it was a new company with a relatively new business model.  As explained by

the Company, Groupon's refund model failed to make appropriate estimates regarding the high

volume of refunds or returns that came in during the first and second weeks of January 2012 for

higher price point Groupons sold in the fourth quarter of 2011.  As a new company with little to

no historical experience with the higher price point items, Groupon did not have any basis to

make reasonable estimates for refunds, expected costs or losses.

91.     According to the *Wall Street Journal,* Groupon's Chief Accounting Officer, Joe

Del Preto, told CFO Jason Child that the number of refunds "had exceeded all previous models

Groupon had built to predict its customers' behavior."  Howard Schilit, a forensic accountant,

commented on the return policy of Groupon's new business, "Everything would have to be deferred revenue until the end of the refund period. Either [Groupon's executives] didn't know they had to defer, or they wanted to continue to show as much revenue as they could." Vipal Monga, *Groupon Earnings Revision Turns on FAS 48*, Wall St. J., CFO Journal, Apr. 3, 2012. As a result, the Company should not have recognized any revenue until after the end of their refund period.

92.     The Form 10-K also included a discussion of the material weakness identified in the Company's internal controls over financial reporting. This disclosure confirmed the fears in the marketplace that Company's heavy reliance on non-GAAP metrics to measure performance and lack of adequate accounting systems, policies and procedures were at the core of the identified material weakness; nevertheless, the Director Defendants opted to push ahead with the IPO despite being on notice of these deficiencies. For example, the Form 10-K set forth a number of serious admissions:

> In connection with the audit of our financial statements as of and for the year ended December 31, 2011, *we concluded there is a material weakness in internal control over financial reporting related to deficiencies in the financial statement close process. Under standards established by the Public Company Accounting Oversight Board, a material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected and corrected on a timely basis*. See "*Item 9A. Controls and Procedures*".

Groupon, Inc., Form 10-K at 23.

93.     The Company further noted that:

> *Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2011*.

\* \* \*

> *Based on this evaluation, management concluded as of December 31, 2011 that our disclosure controls and procedures were not effective at the reasonable assurance level due to a material weakness in our internal control over financial reporting, which is described below*.

*Id*. at 104 (emphasis added).

94.    In connection with these disclosures, Groupon admitted that it would have to take immediate measures to remediate the material weakness, but its stock exchange listing may be in jeopardy if the corrective actions are unsuccessful:

> We are working to remediate the material weakness. *We have begun taking steps and plan to take additional measures to remediate the underlying causes of the material weakness, primarily through the continued development and implementation of formal policies, improved processes and documented procedures, as well as the continued hiring of additional finance personnel. The actions that we are taking are subject to ongoing senior management review, as well as audit committee oversight*.

\* \* \*

> *If our remedial measures are insufficient to address the material weakness, or if additional material weaknesses or significant deficiencies in our internal control over financial reporting are discovered or occur in the future, our consolidated financial statements may contain material misstatements and we could be required to restate our financial results. In addition, if we are unable to successfully remediate this material weakness and if we are unable to produce accurate and timely financial statements, our stock price may be adversely affected and we may be unable to maintain compliance with applicable stock exchange listing requirements.*

*Id.* at 23-24 (emphasis added).

95.    The Company further went on to explain the effect of the Sarbanes-Oxley Act on the need in the immediate future to assess the effectiveness of its internal controls or face non-compliance in the near future:

> *We are not currently required to comply with Section 404 of the Sarbanes-Oxley Act of 2002, and are therefore not currently required to make an assessment of the effectiveness of our internal controls. However, we will need to evaluate our internal controls over financial reporting in connection with Section 404 of the Sarbanes Oxley Act for the year ending December 31, 2012, and our auditors will be required to attest to our internal controls over financial reporting starting with our annual report for the year ending December 31, 2012.*

*Id.* at 24 (emphasis added).

96.     Even though Groupon went through the IPO-process and filed its Prospectus just five months earlier, it could not warrant, as of the date of filing the 10-K, or in the future, that the Company's internal controls over financial reporting were effective:

> *We are in the early phases of compiling the system and processing documentation needed to comply with such requirements*. We may not be able to complete our evaluation, testing and any required remediation in a timely fashion. During the evaluation and testing processes, if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal control over financial reporting is effective. If we are unable to assert that our internal control over financial reporting is effective, or if our auditors are unable to express an opinion on the effectiveness of our internal control over financial reporting, we could lose investor confidence in the accuracy and completeness of our financial reports, which could have a material adverse effect on the price of our Class A common stock.

*Id*. at 23-24 (emphasis added).

97.     The Form 10-K also discussed that Groupon only recently hired members of senior management, as well as finance and accounting staff, despite Defendant Lefkofsky's admission *almost a year earlier* that the Company did not have sufficient staff.  As the Form 10-K explained, Groupon's management lacked the expertise and skill to comply with the myriad of regulations it was now subject to as a public company:

> *Our management team has worked together for only a limited period of time and has a limited track record of executing our*

> *business plan as a team. **We have recently filled a number of positions in our senior management and finance and accounting staff**. Accordingly, certain key personnel have only recently assumed the duties and responsibilities they are now performing. In addition, **certain of our executives have limited experience managing a large global business operation**. Accordingly, **it is difficult to predict whether our management team, individually and collectively, will be effective in operating our business.***

***

> *The individuals who now constitute our management team have limited experience managing a publicly-traded company and limited experience complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage our transition to being a public company that will be subject to significant regulatory oversight and reporting obligations under the federal securities laws*. In particular, these new obligations will require substantial attention from our senior management and could divert their attention away from the day-to-day management of our business, which could materially and adversely impact our business operations.

*Id*. at 30 (emphasis added).

98.     The Form 10-K went on to discuss the specific material weaknesses that were found in its internal controls, namely the lack of adequate procedures:

> *In connection with the preparation of our financial statements for the year ended December 31, 2011, we concluded there is a material weakness in the design and operating effectiveness of our internal control over financial reporting* as defined in SEC Regulation S-X. . . . The primary factors contributing to the material weakness, which relates to our financial statement close process, were:
>
>> •   *We did not maintain financial close process and procedures that were adequately designed, documented and executed to support the accurate and timely reporting of our financial results*.  As a result, we made a number of ***manual*** post-close adjustments necessary in order to prepare the financial statements included in this Form 10-K.

> • *We did not maintain effective controls to provide reasonable assurance that accounts were complete and accurate and agreed to detailed support, and that account reconciliations were properly performed, reviewed and approved. While these activities should be performed in the ordinary course of our preparing our financial statements, we instead needed to undertake significant efforts to complete reconciliations and investigate items identified in those reconciliations during the course of our financial statement audit.*
>
> • *We did not have adequate policies and procedures in place to ensure the timely, effective review of estimates, assumptions and related reconciliations and analyses, including those related to customer refund reserves.*

*Id.* at 104 (emphasis added).

99.     Even though Groupon had gone through the IPO-process and purportedly had systems and controls already in place to identify and address unforeseen issues with the Company's financial reporting and accounting policies and procedures in a timely manner, the Form 10-K disclosed that the process was only just beginning:

> *With the oversight of senior management and our audit committee, we have begun taking steps and plan to take additional measures to remediate the underlying causes of the material weakness, primarily through the development and implementation of formal policies, improved processes and documented procedures, as well as the hiring of additional finance personnel*.

*Id.* (emphasis added).

100.     In addition, for unexplained reasons, Groupon engaged an additional global accounting firm without disclosing why its current accountants, Ernst & Young, had not been working with the Company to address the underlying causes of its material weaknesses in internal controls over financial reporting:

> In particular, we have been working with another global accounting [sic] in preparation for reporting on the effectiveness of our internal controls, and we have expanded the auditing firm's engagement scope to address the underlying cause of the material

> weakness. However, *we can provide no assurance at this time that management will be able to report that our internal control over financial reporting is effective as of December 31, 2012, or that our registered public accounting firm will be able to attest that such internal controls are effective.*

*Id.* at 104 (emphasis added).

101.    In short, the earnings release and Form 10-K disclosed to investors that this newly public company was wholly mismanaged and non-compliant with basic accounting principles even though it warranted to the SEC during the registration process in no less than eight amendments that it was compliant.

102.    During the registration process, the Director Defendants were presented with a myriad of concrete warnings that these issues existed and would continue to plague the Company once it went public. The Director Defendants, however, signed off on offering documents that warranted all material issues were either addressed or compliant prior to the public float. This was demonstrably untrue in light of the revisions just months after the IPO. The Director Defendants acted with bad faith in allowing the Company to go public while these issues remained present and they knew would bleed over into the period of time when the Company went public.

103.    Response to the write-down and the announcement of material weakness in internal controls was predictably harsh. On March 30, 2012, *The Financial Times* published an article entitled "Groupon Restates 2011 Results," which provided, in part, a discussion of the Company's admissions, which the Financial Times deemed a "restatement":

> Groupon has revealed an accounting restatement that had the effect of wiping out its operating profit for the final months of last year, extending the series of financial hiccups that have bedeviled the fast-growing online coupons company.
>
> *The news late on Friday included an admission of "material weakness" in its internal controls and comes just six months*

41

*after its initial public offering.* It triggered a 7 per cent drop in its shares in after-hours trading.

*** 

Groupon blamed the restatement on its failure to account properly for its move into new markets where there is a higher chance that consumers will demand a refund.

The accounting change reduced the company's reported operating income for the period by \$30m – more than wiping out the \$15m it had previously reported for the period. It had less impact on revenues, shaving \$14.3m from the \$506m that had been reported before.

The admission of the latest error follows accounting changes Groupon was forced to make as it was preparing for its initial public offering last year. These included a restatement of the way it calculates revenues, as well as an agreement to de-emphasise its preferred measure for profits, known as "adjusted consolidated segmental operating income", after criticism from the SEC.

Richard Waters, *Groupon restates 2011 results*, Fin. Times, Mar. 30, 2012,

http://www.ft.com/intl/cms/s/0/38c6bd4c-7aad-11e1-8ae6-00144feab49a.html#axzz1rfGpe68K

(emphasis added).

104. *Bloomberg* reported, in an article entitled "Groupon Reports 'Material Weakness,'

Restates Quarterly Revenue," that:

The announcement marks another setback for Groupon, which has struggled to get its financial statements in order since filing for an initial public offering in June. Two months after its prospectus, the company abandoned a controversial accounting method for operating income after a review by the Securities an Exchange Commission. Groupon then restated 2010 results in September because it had counted the total amount of its daily-deal sales as revenue, including fees paid to merchants.

"This feeds some of the negative sentiment around their disclosure," said Ken Sena, an analyst at Evercore Partners Inc. in New York, who has an equalweight rating on Groupon shares.

*** 

'Wildly Profitable'

42

Groupon also stumbled ahead of its IPO when Chairman Eric Lefkofsky said the company is "going to be wildly profitable" in an interview with Bloomberg News. In July, the company updated its IPO filing, asking investors to disregard those comments because they didn't accurately or completely reflect his views.

\*\*\*

[ ] In response to the conclusion that the company's internal controls contained a material weakness, Groupon said it's been working for several months with an accounting firm and will report on the effectiveness of those controls by the end of the year. While Groupon's independent auditor is Ernst & Young LLP, the company said it's working with a different accounting firm.

The auditors are at fault for not identifying problems with the financial controls earlier, said Herman Leung, an analyst at Susquehanna Financial Group in San Francisco.

Lack of Controls?

"This should have been highlighted by the auditors," said Leung, who has a neutral rating on shares of Groupon and doesn't own the stock. ***"The business is growing so fast that it sounds like they don't have the proper financial controls to deal with the growth."***
…

Ari Levy, *Groupon Reports 'Material Weakness,' Restates Quarterly Revenue*, Bloomberg, Mar. 31, 2012, at http://www.bloomberg.com/news/2012-03-30/groupon-discloses-material-weakness-lower-quarterly-revenue.html (emphasis added).

105.    These news stories reflected the market's reaction, which on the news of the revision, drove Groupon's stock price down $3.10 per share to close at $15.28 per share on April 2, 2012, a decline of 17% on volume of 10 million shares.  The market is still punishing Groupon for the Company's lack of internal controls.  In fact, as of July 27, 2012 Group's shares were trading at $7.59 per share, representing a loss of 62% from its IPO price.

106.    Investors were not the only ones up in arms after the Company's disclosure of material weakness in its accounting controls.  In an April 1, 2012 blog post entitled "Groupon's

First 10-K: April Fool's!", accounting professors Anthony Catanach and Edward Ketz wrote on

their Grumpy Old Accountants website that Groupon was ripe for disaster for months:

> What's all the hoopla about Groupon's latest "revision" to its financial reports and lack of internal controls? Why is everyone acting so surprised? You should have known something was up when the … 10K was so long in coming after earnings were originally released on February 8th.  Moreover, we warned you all in "Trust No One, Particularly Groupon's Accountants," that this day would come soon. Remember this?

Anthony H. Catanach, Jr. & J. Edward Ketz, *Groupon's First 10-K: April Fool's!*, Grumpy Old

Accountants, Apr. 1, 2012, at http://blogs.smeal.psu.edu/grumpyoldaccountants/archives/593.

107.    Catanach and Ketz went on to explain that flawed internal controls were

inevitable in light of its rapid expansion and inexperienced management, which was confronted

for the first time with the need to make accounting decisions on behalf of a reporting company:

> *It is absolutely ludicrous to think that Groupon is anywhere close to having an effective set of internal controls over financial reporting, having done 17 acquisitions in a little over a year. When a company expands to 45 countries, grows merchants from 212 to 78,466, and expands its employee base from 37 to 9,625 in only two years, there is little doubt that internal controls are not working somewhere. Any M&A expert will agree. And don't forget that Groupon admitted to having an inexperienced accounting and reporting staff*.
>
> ***
>
> So, what should all this mean for investors and market regulators? Well, *first of all, the Groupon[] earnings revision which was prompted by an increased reserve requirement for customer refunds, highlights the subjectivity and uncertainty associated with any accounting assumptions (or judgments) made by relatively "new" companies, operating in "new" industries, with inexperienced management: yes, internet companies! In short, internet company accounting is suspect given all the unsupported assertions and assumptions that must be made to comply with generally accepted accounting principles, not to mention the likely internal control weakness issue.*

*Id.* (emphasis added).

108. Further, Professors Catanach and Ketz related concerns that there was an actual breakdown in internal controls and the Board cavalierly ignored the problem and even rewarded management in the face of its concerted failure:

> *Next, we question whether there is any real corporate governance at Groupon whatsoever. Usually, when material weaknesses surface, heads roll … not at Groupon! Instead the board of directors awarded the Company's chief financial officer with a salary increase and bonus.* According to a Groupon 8K filed on March 19, 2012:
>
>> Mr. Child's base salary was increased from $350,000 to $380,000 per year. This increase will be effective on April 1, 2012 … Mr. Child's annual bonus guarantee of $350,000 will remain in place for 2012, and he will receive half of the guaranteed bonus in June 2012. The remainder of the guarantee plus any additional bonus earned under the plan will be paid in the first quarter of 2013.

*Id*. (emphasis added).

109. Finally, the report stated that the Company's improper conduct, issues surrounding refunds and lack of internal controls likely began long before fourth quarter 2011, but as early as during the IPO process:

> *Finally, do you really believe that this material weakness in internal control (and related refund issue) mysteriously appeared in the fourth quarter of 2011? Of course not, but by assigning it to the fourth quarter of 2011, Groupon and E&Y can avoid the embarrassment of admitting that the financial statements included in the Company's IPO filing were incorrect. This is probably not a bad strategy from their perspective given the impending securities litigation that is now lurking.*
>
> In closing, we just want to remind you of another warning we issued in September of 2011 in "Is Groupon 'Cooking Its Books'": *weak control environments offer managers the opportunity to manipulate reported financial results with impunity.* No one will know, not even the auditors. …

*Id*. (emphasis added and in original).

110. Shortly after news of the Company's accounting woes and internal control

deficiencies became public, the SEC began an investigation. On April 3, 2012, in an article entitled "SEC Probes Groupon," *The Wall Street Journal* reported, in pertinent part, the following:

> The Securities and Exchange Commission is examining Groupon Inc.'s revision of its first set of financial results as a pubic company, according to a person familiar with the situation.

Shayndi Raice and Jean Eaglesham, *SEC Probes Groupon,* Wall St. J. Apr. 3, 2012. http://online.wsj.com/article/SB10001424052702303816504577319870715221322.html.

111. Criticism began to bleed over from frustration with accounting practices to an open assault on the Board's integrity. For instance, on April 13, 2012, *Forbes* published "Groupon: concerns over the board never mind the audit committee," by Paul Hodgson, the Chief Communications Officer and Senior Research Associate for GMI, the independent global leader in corporate governance and ESG (Environmental, Social and Corporate Governance). The article raised serious questions about the Board's ability to perform its duties effectively given the interlocking directorships, lack of financial expertise and concentration of voting power vested with the Company's founders (Lefkofsky, Keywell and Mason). Critically, Hodgson asserted that the Company's Audit Committee lacked a qualified financial expert:

> Groupon's financial statements would appear to be a victim of the firm's rapid growth. The company revised its fourth-quarter results in March, the first results it posted as a public company. The original revenue figures were cut by $14.3 million. The company also said it found a material weakness in controls over its financial statements.

> This has raised concerns over the skillset of the audit committee of the board. The audit committee consists of Kevin Efrusy, Theodore Leonis and Howard Schulz. ***NASDAQ, where Groupon is listed, requires at least one audit committee member to be a financial expert***. Such an individual was defined originally by the SEC as a person with accounting or finance experience. In 2003, the SEC changed the rules to include chief executives who had supervised finance or accounting staff. ***Groupon says that Mr. Leonis meets***

> *the SEC's definition of a financial expert, though he would not be so designated by GMI Ratings*. Indeed, I was recently quoted in a Reuters' article as saying: "It is best practice to have at least one such director on the audit committee, as not having such expertise has been shown to lead to the very problems experienced by Groupon."

Peter Hodgson, *Groupon: concerns over the board never mind the audit committee*, Forbes, Apr.

13, 2012, at http://www.forbes.com/sites/paulhodgson/2012/04/13/groupon-concerns-over-the-

board-never-mind-the-audit-committee/ (emphasis added).

112.    Hodgson went on to state that the members of the Board were professionally

over-extended and unable to perform the necessary oversight duties:

> Eric Lefkofsky – co-founder, Chairman. Also on the boards of Echo Global Logistics and InnerWorkings, also director/manager of MediaBank. Was former COO and director of HA-LO until its bankruptcy in 2001.

> Peter Barris – elected under a voting agreement with New Enterprise Associates (NEA). Also on the boards of Echo Global Logistics, InnerWorkings, Vonage Holdings and Neutral Tandem, and is the Managing General Partner of NEA which is a technology investment firm.

> Kevin Efrusy – elected under a voting agreement with Accel Growth Fund, where he is general partner. Also serves on the boards of directors of several private consumer internet service and SaaS/open source software companies.

> Bradley Keywell – co-founder, elected by Series B preferred stockholders, also director of Echo Global Logistics, he is a manager at Lightbank, a private investment firm, and MediaBank. He was also a president at HA-LO until it filed for bankruptcy. He is also a director/trustee of Equity Residential.

> Theodore Leonsis – Vice Chairman, elected by common stock and preferred stock holders. Also CEO of Monumental Sports & Entertainment, Vice Chairman Emeritus of AOL, director of American Express, Rosetta Stone, and NutriSystem, as well as sitting on the boards of several private internet and technology companies.

> Howard Schultz – CEO of Starbucks.

*Id.*

113.     Hodgson further expressed concern that the Board lacked a member with the

mandated financial expertise, that was not distracted by other endeavors:

> And this ignores all of their non-profit board responsibilities
> which, I can tell you, are numerous. ***This is a board where a CEO
> of a major S&P 500 company is the least busy board member.
> Every other director is a director on multiple boards of either
> public or private companies, or both, as well as having executive
> duties at other firms.*** Mr. Leonsis is a CEO at one firm, a director
> at three major public companies, and a director at a range of
> private firms that appear to be too numerous to list. ***It hardly
> seems surprising that, even assuming he has the financial
> expertise, he was unable to monitor accounting practices at the
> company in an effective manner***.

*Id.*

114.     Hodgson's criticism extended further to indict what he believed was the type of

corporate cronyism that rendered the board ineffective:

> ***But it is not simply the overboardedness of these individuals, it is
> the interlocking nature of their experience***, not to say the
> involvement of two of them in a company that went bankrupt. ***Mr.
> Barris, Mr. Lefkofsky, and Mr. Keywell have numerous board
> memberships and other positions at the same companies as each
> other.***
>
> ***Just one of these issues – overboarding, interlocking
> directorships, lack of financial expertise – would be enough to
> hang a question mark over this board, but all three together
> raises serious questions about the ability of this board to perform
> its duties effectively***.

*Id.*

115.     Finally, Hodgson articulated how Lefkofsky, Keywell and Mason structured the

Company and its IPO in a way that assured them total control after they made millions on the

IPO, the ability to stack the Board, and disregard stockholder discontent regardless of the result:

> ***As if that weren't enough of a governance nightmare, Groupon's
> Class B common stock has 150 votes per share and its Class A***

> *common stock has one vote per share. As of December 31, 2011,*
> *the three founders, Eric P. Lefkofsky (on the board), Bradley A.*
> *Keywell (on the board) and Andrew D. Mason (CEO and on the*
> *board) control 100 percent of the outstanding Class B common*
> *stock and approximately 33.5 percent of the outstanding Class A*
> *common stock, representing approximately 57.4 percent of the*
> *voting power of our outstanding capital stock.* As the offering
> filing has it:
>
> > *as a result of the concentration of our capital stock*
> > *ownership with our founders, they will have significant*
> > *influence over management and over all matters*
> > *requiring stockholder approval*, including the election of
> > directors and significant corporate transactions, such as a
> > merger or other sale of our company or its assets, for the
> > foreseeable future.

*Id.* (emphasis added).

116. Since before and after it went public, the Company, its Board, and management had been under siege from regulators, investors, customers, and governance pundits in the press. Instead of applying a steady hand, the Board continued its supine approach and allowed Mason to make appearances with employees while confessing how bad Groupon was at being a public company. That the Board did not consider discharging Mason in light of his conduct and his admission that he was unfit to be a CEO of a public entity "taking stupid risks" is yet another example of its failure to act in the face of serious red flags regarding the competence of management.

117. Specifically, Mason did nothing to rehabilitate his image as Groupon's CEO and board member when he hosted a Groupon town hall meeting shortly after the March 30th announcement. As the *Wall Street Journal* reported in an April 26, 2012 article entitled "Groupon Must Avoid Taking 'Stupid Risks,' CEO Says":

> Groupon Inc. Chief Executive Andrew Mason told the company's
> employees Wednesday that the daily-deals site needs to grow up –
> right after he apologized for drinking too much beer.

> In a wide-ranging town hall meeting with employees that lasted about an hour Wednesday, the 31-year-old CEO at times swigged from a beer bottle while he set corporate priorities for the next six months, including beefing up financial controls and hiring more finance staff. Mr. Mason also discussed how the Chicago company doesn't "have any margin for error."
>
> ***
>
> ***The financial revision, Mr. Mason said at the meeting Wednesday, was "the latest in a string of just us making an example of how bad we are at being a public company**. We have to get good at this."*
>
> In the meeting, Mr. Mason said Groupon made a strategic decision to grow quickly to race ahead of competitors in the nascent local-deals industry. Now, he said, ***Groupon needs to slow down and focus on fewer initiatives, including on "quality and control" and "not taking stupid risks."***

Shira Ovide, *Groupon Must Avoid Taking 'Stupid Risks,' CEO Says,* Wall St. J., Apr. 26,

2012, at http://online.wsj.com/article/SB10001424052702304723304577366282578172486.html

(emphasis added).

118.    On April 30, 2012, the website All Things D(igital) reported that Director

Defendants Schultz and Efrusy were leaving the Company's Board of Directors and noted,

among other things, that Schultz almost left Groupon prior to the completion of the IPO.  The

article, in pertinent part, provided more color on how the Board was both financially unqualified

and its members were unable to effectively govern and oversee management:

> According to sources close to the situation, Starbucks Chairman and CEO Howard Schultz and Accel Partners' Kevin Efrusy will be stepping down from the board of Groupon.
>
> Schultz's departure will be effective today, but Efrusy – who was critical to the initial funding around the Chicago-based daily deals site – will not be standing for re-election at the company's annual meeting in June.
>
> The departures are voluntary, but sources said the pair will be replaced by two new directors with significantly more fiscal

50

oversight experience, whom one source characterized as "accounting types."

\*\*\*

It is a move that is critical, given Groupon's recent series of missteps around its financial reporting that have hurt both its reputation and, more importantly, its stock.

***Interestingly, several sources noted that Schultz almost left the board right before Groupon's public offering last fall, after several ongoing disputes with its management, but stayed on so as not to scuttle its IPO.***

Kara Swisher, *Confirmed: Schultz and Efrusy to Leave Groupon Board; "Accounting Types" Joining,* All Things D, Apr. 30, 2012, at http://allthingsd.com/20120430/exclusive-schultz-and-efrusy-to-leave-groupon-board-accounting-types-joining/ (emphasis added).

119.    Despite repeated calls for his firing after news of the Company's material weaknesses became public, Groupon's CFO Jason Child, is not only still employed at Groupon, but he received a pay raise in 2012, as the Company's market capitalization and reputation continued to plummet.

120.    Groupon's problems continue to escalate. On July 26, 2012, an article published on *Business Insider* discussed the recent downgrade of Groupon's stock by analyst Ken Sena at Evercore Partners.  In his note, Sena lashed out at the Company's lack of transparency regarding Groupon's first quarter 2012 results:

We are reducing our rating given our concerns over the transparency and disclosure of the 1P [first-party] Goods business, coupled with signs of deterioration within the core daily deals business.

New information has emerged related to the company's Goods category that makes us question the composition of the 1Q12 North America revenue beat...

> In addition, billings data for North America and International are trending well below consensus, indicating a sequential q/q decline vs. Street expectation for high single digit billings improvement.

Henry Blodget, *Analyst Downgrades Groupon And Basically Accuses The Company Of Fraud*, Business Insider, Jul. 26, 2012, at http://www.businessinsider.com/analyst-downgrades-groupon-fraud-2012-7.

121.    As the *Business Insider* article reported, Sena believed Groupon misrepresented its first quarter results on its recent earnings call:

> In Q1, Groupon surprised Wall Street by reporting that North American revenue growth had accelerated sharply from the prior quarter, to 32% year over year.
>
> This positive surprise reassured investors and caused the stock to jump.
>
> On the company's conference call, Sena says, Groupon's management explained the revenue acceleration as being the result of two factors: Improved Deal Targeting [ ] and Increased "Deal Density" (offering more deals closer to where people live).

*Id.*

122.    The market applauded management's explanation because it appeared that Groupon was able to drive increased sales without spending more on marketing. As the *Business Insider* reported, however, after the earnings call, Sena determined that Groupon's growth in Q1 2012 was not due to the Company's targeting improvements; instead it was due to the launch of Groupon Goods, which accounted for its revenue differently than the rest of Groupon's business.

123.    The *Business Insider* article explained that when Groupon sells through Groupon Goods, it books 100% of the sales price as revenue. In contrast, when it sells coupons for other merchants (its core business), it can only book the portion of the coupon price that it keeps. In Groupon's most recent filing with the SEC, the Company contradicted management's prior statements made on the earning call. Specifically, the Form 10-Q explained that the first quarter

growth was primarily driven by the launch of the Goods business, which uses different accounting treatment, rather than by improved deal targeting or increased deal density, as was stated in the conference call.

124.    As the *Business Insider* article noted, Sena criticized the Company's lack of transparency on its Q1 call, then slashed his growth outlook and target price for Groupon from $17.00 to $9.00.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

125.    Plaintiffs bring this action derivatively in the right and for the benefit of Groupon to redress injuries suffered, and to be suffered, by the Company as a direct result of the Director Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment and violations of federal securities laws.  Groupon is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

126.    Plaintiffs will adequately and fairly represent the interests of Groupon in enforcing and prosecuting its rights.

127.    The following eight Director Defendants constituted the Company's Board of Directors:  Mason, Lefkofsky, Keywell, Barris, Leonsis, Schultz, Efrusy and Hobson.

128.    Plaintiffs did not make a pre-suit demand upon the Company's Board of Directors to bring this action on behalf of Groupon because such demand would have been a futile, wasteful and useless act for the reasons set forth below.

129.    Each of the Director Defendants is specifically implicated by the misconduct complained of herein as each is either: (a) a founder and controlling shareholder; (b) a signatory of the IPO documents; and/or (c) a member of the Audit Committee.  As a result, a majority of the Board is implicated in the wrongdoing complained of herein, thus, rendering demand futile.

130.    This action is being pursued derivatively on behalf of Groupon because the Company's Board of Directors is grossly conflicted and each of the Director Defendants faces a substantial likelihood of liability that prevents him or her from exercising independent and disinterested business judgment for purposes of evaluating demand with respect to the allegations herein.

131.    At all relevant times, including the IPO registration process and thereafter, Director Defendants were fully aware that Groupon lacked adequate controls and procedures and were complicit in the rapid growth of the Company. Indeed, they were in the trenches pushing for such growth from the beginning. Defendant Barris conceded as much in an interview for a November 7, 2011 article in *Fortune*: "Once [the Groupon] model got traction, I became a pain in the ass, pushing [CEO] Andrew Mason to grow quickly. I told them they should be expanding to four cities a month, which they did. Until they began expanding to 10."

132.    Director Defendants were also aware that: (a) as a public company, Groupon would need to implement financial reporting systems and controls compliant with GAAP; and (b) having implemented such systems and controls, they would be directly charged with oversight of those mechanisms. Each of the Director Defendants, however, failed to make a good faith effort to comply with their obligations of oversight.

133.    Throughout the IPO process, Groupon was repeatedly criticized by both the SEC and financial press for its use of improper and misleading accounting procedures and metrics in its Registration Statement. To address the criticism, Groupon was forced to amend the Registration Statement no less than eight times to, among other things, eliminate misleading non-GAAP accounting measures and restate its financial results. Each of the Director Defendants signed each and every amended Registration Statement. Thus, they could not have been unaware

that Groupon was required to adhere to GAAP and that substantial oversight and strict controls and procedures were necessary to ensure that the Company was in compliance with the applicable rules, regulations and laws.

134.    Each of the Director Defendants knew of the following during the IPO process:

a.      The Registration Statement filed on June 2, 2011 contained an unusual and controversial non-GAAP financial measure (ACSOI) which the SEC considered to be misleading.   Groupon was forced to remove the presentation of ACSOI from the Registration Statement.

b.      In September 2011, Groupon had to restate its financial results from the first half of 2011.   The restatement disclosed a massive reduction in the Company's revenue from $1.52 billion to $688 million.   Groupon issued the restatement in order to correct for an error in its presentation of revenue.   Historically, the Company reported the **gross amounts billed to its subscribers** as revenue.   The SEC instructed Groupon to revise its revenue calculations so they reflected the **net amount Groupon retains after paying the merchant fees**.

c.      In the Registration Statement, the Prospectus and numerous amendments reported therein, which were all signed by the Director Defendants,[2] Groupon acknowledged that due to its conversion into a publicly traded company, its financial statements would be subject to a higher degree of oversight.

135.    Despite knowledge of the foregoing, Director Defendants: (a) continued to permit Groupon to operate and function without adequate accounting controls, systems, policies, procedures, controls and personnel in place; and (b) failed to reasonably exercise appropriate

---

[2] Hobson did not sign the initial Registration Statement.

oversight in order to address known deficiencies. As a result, each of the Director Defendants faces a substantial threat of liability for their breaches of fiduciary duty, which renders them unable and unfit to objectively evaluate the basis for pre-suit demand.

136. Defendants Leonsis, Efrusy and Schultz are members of the Audit Committee. The Audit Committee is responsible for oversight of the quarterly regulatory reporting process, internal compliance audits, results of external audits, and review of management's reports on cases of financial misconduct by employees, officers or directors. The members of the Audit Committee are required to, among other things: monitor the integrity of the Company's financial statements and compliance with legal and regulatory requirements as they relate to financial statements or accounting matters; and review the adequacy and effectiveness of the Company's internal control policies and procedures.

137. Defendants Leonsis, Efrusy and Schultz failed to discharge their oversight duties to ensure the integrity of the financial statements of Groupon, or compliance with legal and regulatory requirements as related to accounting matters. Moreover, despite knowledge that Groupon lacked adequate controls and systems for financial reporting, Leonsis, Efrusy, and Schultz failed to exercise appropriate oversight to address known deficiencies. Only after Groupon was forced to disclose that its disclosure controls and procedures were not effective at the reasonable assurance level due to material weakness in the internal controls over financial reporting, did the Audit Committee belatedly realize that it could no longer consciously disregard its duties. As confirmed in the Form 10-K:

> With the oversight of senior management and our audit committee, ***we have begun to take steps and plan to take additional measures to remediate the underlying causes of the material weakness, primarily through the development and implementation of formal policies, improved processes and documented procedures***, as well as the hiring of additional finance personnel.

Groupon, Inc., 10-K March 30, 2012,
http://www.sec.gov/archives/edgar/data/1490281/000144530512000922/groupon10-K.htm.

138.    As a result of their breach of their duties, demand upon Leonsis, Efrusy and Schultz is futile.

139.    Demand is likewise futile because the Director Defendants stand at personal risk from the multiple legal and regulatory proceedings facing Groupon. Specifically, the Director Defendants' violations of the Securities Act, which are subject to an SEC investigation, presents the substantial risk of civil fines and/or an order of disgorgement directing the Director Defendants to return the full amount of any profits derived from the IPO. Further, the SEC may request a court to order a bar or suspension of any Director Defendant that was found to have violated Section 17(a) of the Securities Act from acting an officer or director of an issuer that has a class of securities registered under the Exchange Act.

140.    Additionally, each of the Director Defendants has conflicts of interest that prevent him or her from exercising independent and disinterested business judgment in response to demand here.

141.    Defendant Mason is the CEO of Groupon and is a founder of the Company. Mason is one of the controlling shareholders of Groupon and collectively holds approximately 57.8% of the Company's voting power. Mason's position and income from Groupon comes from a material relationship that he has with Defendant Lefkofsky. That relationship and the benefits therefrom cast significant doubt on Mason's ability to exercise independent and disinterested business judgment in considering demand here. Prior to becoming the CEO of Groupon, Mason was employed by Lefkofsky as software developer at InnerWorkings. After co-founding Groupon with Mason, Lefkofsky provided Mason with the Company's first angel

investment of $1 million and has been essentially responsible for all subsequent rounds of pre-IPO investor funding. Further, Mason is beholden to Lefkofsky for the compensation he received pre-IPO to cash out 7,465,512 shares of his Groupon voting common stock. Mason was paid almost $28 million to redeem those shares before the IPO. As a result, demand on Mason is futile.

142. Defendant Lefkofsky is a co-founder of Groupon and the Executive Chairman of the Board. Lefkofsky is one of the controlling shareholders of Groupon and collectively holds approximately 57.8% of the Company's voting power. He also derives substantial income from his professional relationship with Groupon. Lefkofsky was paid in excess of $386 million pre-IPO to redeem 65,473,912 shares of Groupon voting common stock. Lefkofsky has material relationships with Defendants Barris, Keywell and Leonsis which cast significant doubt on his ability to exercise independent and disinterested business judgment in considering demand here. For example, in addition to Groupon, Lefkofsky and Barris served on the board of directors of MediaBank, Echo, InnerWorkings and BenchPrep. Each of these companies was co-founded by Lefkofsky. Each of these companies has received substantial investments from NEA. Lefkofsky and Keywell serve together on the board of directors of MediaBank, Echo, BenchPrep and Light Bank. Lefkofsky and Leonsis serve together on the board of directors of MediaBank. Lefkofsky's service on multiple boards of directors with each of these Defendants cast significant doubt on his ability to exercise independent and disinterested business judgment in considering demand with respect to any one of them. As a result, demand on Lefkofsky is futile.

143. Defendant Keywell is a co-founder of Groupon and he similarly derives substantial income from his professional relationship with Groupon. Keywell was paid in excess of $156 million pre-IPO to redeem 25,568,288 shares of Groupon voting common stock.

Keywell has material relationships with Defendants Mason and Lefkofsky which cast significant doubt on his ability to exercise independent and disinterested business judgment in considering demand here. Keywell is one of the controlling shareholders of Groupon who collectively hold approximately 57.8% of the Company's voting power. Individually and collectively, these Defendants, by their position as controlling shareholders, have profited from the Company's improper accounting procedures and continue to do so. They also have a distinct conflict of interest with the unaffiliated minority shareholders and the Company itself. And, as indicated above, Keywell serves on multiple boards of directors with Lefkofsky, Barris and Leonsis which cast significant doubt on his ability to exercise independent and disinterested business judgment in considering demand with respect to those Defendants. As a result, demand on Keywell is futile.

144. Defendant Barris has material relationships with Defendants Lefkofsky, Keywell, and Leonsis which cast significant doubt on his ability to exercise independent and disinterested business judgment in considering demand here. As indicated above, Barris serves on multiple boards of directors with Lefkofsky, Keywell and Leonsis. In addition to these material relationships, Barris is also the Managing General Partner of NEA. NEA was a pre-IPO investor in Groupon that received in excess of $70 million to redeem 3,622,524 shares of Groupon Series D preferred stock and 809,640 shares of Groupon Series E preferred stock before the Company went public and, as of November 2011, it held 13.8% of the Company's equity. NEA is also a significant investor in Echo, InnerWorkings, MediaBank and BenchPrep. Thus, NEA has financial and reputational interests that this action be terminated. Barris has a material relationship with NEA which cast significant doubt on his ability to exercise independent and disinterested business judgment in considering a demand here. As a result, demand on Barris is

futile.

145.    Defendant Leonsis has material relationships with Defendants Lefkofsky, Barris and Keywell.  As indicated above, Leonsis, Lefkofsky, Barris and Keywell serve together on the board of directors of MediaBank.  Leonsis and Barris also serve together on the board of directors of SnagFilms.  The material relationships with these Defendants cast significant doubt on Leonsis' ability to exercise independent and disinterested business judgment in considering demand here.  Additionally, Leonsis was paid in excess of $200,000 pre-IPO to redeem 77,892 shares of Groupon non-voting common stock.  Demand on Leonsis is, therefore, futile.

146.    Defendant Efrusy has a material relationship with Accel and entities affiliated therewith which cast significant doubt on his ability to exercise independent and disinterested business judgment in considering a demand here.  Efrusy is the General Partner of Accel. Entities affiliated with Accel were pre-IPO investors in Groupon that collectively received almost $20 million to redeem 2,532,444 shares of Groupon Series E preferred stock before the Company went public and, as of November 2011, held 5.2% of the Company's equity.  Accel has financial and reputational interests that this action be terminated.  As a result, demand on Efrusy is futile.

147.    Defendant Schultz has a material relationship with Defendant Hobson which casts significant doubt on his ability to exercise independent and disinterested business judgment in considering demand here.  Schultz and Hobson serve together on the board of directors of Starbucks.  Additionally, Schultz has material relationships with Maveron and several affiliated partnership of Maveron.  Schultz is a co-founder of Maveron and both he several affiliated partnerships of Maveron were pre-IPO investors in Groupon.  According to published reports, Schultz "almost resigned from the board right before Groupon's public offering … after several

ongoing disputes with its management, but stayed on so as not to scuttle its IPO." Swisher, *Confirmed: Schultz and Efrusy to Leave Groupon Board; "Accounting Types" Joining,* at http://allthingsd.com/20120430/exclusive-schultz-and-efrusy-to-leave-groupon-board-accounting-types-joining/. In addition to his financial interests, Schultz has reputational interests that this action be terminated. Schultz, therefore, has material relationships which cast significant doubt on his ability to exercise independent and disinterested business judgment in considering a demand here. As a result, demand on Schultz is futile.

148. Defendant Hobson has a material relationship with Defendant Schultz which casts significant doubt on her ability to exercise independent and disinterested business judgment in considering demand here. Hobson and Schultz serve together on the board of directors of Starbucks. As a result, demand on Hobson is futile.

149. Demand is further excused where three board members (Mason, Lefkofsky, and Keywell) are the controlling Groupon shareholders possessing 57.8% of Groupon's voting power. These three individuals have the power to appoint all other directors. As admitted in Groupon's Registration Statement, "as a result of the concentration of our capital stock ownership with our founders, they will have significant influence over management and over all matters requiring stockholder approval, including the election of directors…." Groupon, Inc. Registration Statement at 89.

150. Director Defendants, and the institutions and individuals with which they possess material relationships, have benefitted and will continue to benefit from the wrongdoings alleged herein. Director Defendants have engaged in such conduct in order to preserve their positions, control and substantial financial benefit derived thereof, and are incapable of exercising independent, objective judgment whether to bring this action on behalf of Groupon

151. Six of the eight Director Defendants have served on the Company's board for three years or longer and have profited handsomely by their involvement with Groupon. As indicated above, they have developed professional and personal relationships, entangled financial alliances and interests, and therefore, cannot and will not vigorously prosecute any action on behalf of the Company. Director Defendants have not even started an investigation so as to enable them to take action against the responsible parties.

152. Director Defendants' failure to exercise appropriate oversight disclosure controls and procedures has resulted in significant damage to Groupon. Indeed, a mere five months after going public, the Company was forced to admit that it had "material weaknesses" in its internal controls over financial reporting. There has been no assurance made that this problem is not more extensive than initially disclosed.

153. Demand is further excused because the Complaint alleges a fiduciary duty claim that seeks to hold the Director Defendants accountable for a corporate trauma – revisions to financial reports in the wake of an IPO and detailed admissions that the Company lacked the requisite financial controls and compliance mechanisms needed by a public company.

154. Under the circumstances, there is a sufficient connection between the events that harmed the Company and Board involvement in decisions that violated the Federal Securities laws in connection with the IPO. Here, the Director Defendants signed the Registration Statement and its many amendments knowing that the Company's accounting practices were problematic and the Company lacked experienced leadership that would implement sufficient internal controls. The close, temporal proximity between the SEC warnings to the Company during the IPO-process that certain accounting practices needed to be clarified, and the revisions and disclosure of material weakness in the Company's *first* financial statement almost

immediately after the IPO, amply demonstrates that the Director Defendants allowed the Company to go public despite being non-complaint with the very issues the SEC had raised.

155.    The circumstances of the case also demonstrate demand futility even if the conscious act of signing a sparse offering document to rush the Company to market are placed to the side.

156.    Here, the Director Defendants ignored numerous warnings or "red flags" indicating misconduct in defiance of their duties.  First, there were the eight SEC required amendments in the Registration Statement.  There were instances where Mason and Lefkofsky spoke, either on TV or via-e-mail, in a manner that violated certain solicitation rules that resulted in SEC admonishment.  There was the rapid business expansion and statements by Lefkofsky that there were not enough qualified people at the Company to exercise sufficient internal controls.  During the IPO process, the Company was forced to abandon its proprietary ACSOI accounting metric and, once it did, operating income suddenly became losses.  The SEC questioned the Company's refund accrued and revenue recognition policies, as well.

157.    Simply stated, foisted before the Director Defendants were enough warnings that they were logically on notice of the Company's accounting problems and lack of internal controls; any board that fails to act in the face of such information has made a conscious decision not to act.  The failure to act in such circumstances is as actionable as any affirmative decision to engage in malfeasance.

158.    Accordingly, in this case, demand is excused for numerous overlapping and independent reasons.

## CAUSES OF ACTION

## COUNT I

## (BREACH OF FIDUCIARY DUTY)

159.  Plaintiffs incorporate by reference each and every allegation made above, as though set forth herein.

160.  Director Defendants, individually and collectively, owe and owed the Company the duty to exercise good faith, loyalty and candor in the management, administration and oversight of the Company's business and affairs, particularly regarding issues as germane as proper internal accounting and financial controls.

161.  The conduct of Director Defendants, individually and collectively, as set forth herein, was due to their intentional, knowing and/or reckless disregard of the fiduciary duties owed to the Company.

162.  Director Defendants, individually and collectively, breached their fiduciary duties by willfully participating in and causing the Company to unnecessarily waste corporate funds. Further, Director Defendants failed to properly oversee Groupon's business and affairs, the failure of which renders them personally liable to the Company.

163.  As a direct and proximate result of Director Defendants' breaches of fiduciary duties, Groupon has experienced and will continue to experience significant harm. As a result of the wrongdoing alleged herein, Director Defendants are liable to Groupon.

## COUNT II

## (ABUSE OF CONTROL)

164.  Plaintiffs incorporate by reference each and every allegation above, as set forth herein.

165.  As alleged herein, Director Defendants' misconduct, individually and

collectively, constituted an abuse of their control and influence over Groupon, for which they are legally responsible.

166.    As a direct and proximate result of Director Defendants' abuse of control, the Company has sustained significant damages.

167.    As a direct and proximate result of Director Defendants' breaches of their fiduciary duties of good faith, loyalty and candor, the Company has suffered and will continue to suffer significant damages and harm.  As a result of the wrongdoing alleged herein, Director Defendants are liable to Groupon.

168.    By reason of the foregoing, Groupon has been damaged.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiffs may maintain this action on behalf of the Company and that Plaintiffs are adequate representatives;

B.    Declaring that Director Defendants have breached and/or aided and abetted the breaches of fiduciary duties to Groupon;

C.    Determining and awarding damages to Groupon for the harm suffered as a result of the violations set forth above from each of the Director Defendants, jointly and severally, with interest thereon;

D.    Ordering Groupon and Director Defendants to take all necessary reforms to improve its corporate governance and internal procedures to comply with the applicable rules, regulations and laws and to protect Groupon from a repeat of the damaging events described herein, including, but not limited to putting forth a shareholder vote on the following resolutions to amend the Company's By-Laws and Articles of Incorporation:

1.      A provision which would permit the shareholders of the Company to nominate at least three candidates for election to the Board;

2.      A provision which would strengthen the Board's supervision and oversight of operations and implement procedures for greater shareholder input into the policies of the Board;

3.      A proposal which would ensure the implementation of effective oversight to ensure compliance with the applicable rules, regulations and laws.

E.      Determining and awarding Groupon enhanced damages in an amount necessary to punish Director Defendants and to deter future behavior of a similar nature;

F.      Awarding Groupon restitution from Director Defendants;

G.      Awarding Plaintiffs costs and disbursements of this action, including reasonable attorney's fees, experts' fees, costs and expenses; and

H.      Granting such other and further equitable relief as the Court may deem proper

## **JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand trial by jury.


Dated: July 30, 2012                          Respectfully submitted,

                                              By: /s/ Adam J. Levitt
                                              Adam J. Levitt
                                              Edmund S. Aronowitz
                                              **WOLF HALDENSTEIN ADLER**
                                              **  FREEMAN & HERZ LLC**
                                              55 West Monroe Street, Suite 1111
                                              Chicago, Illinois 60603
                                              Tel:  (312) 984-0000
                                              Fax: (312) 984-0001

Gregory Mark Nespole
Fred Taylor Isquith
Stacey Kelly Breen
Malcolm T. Brown
**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Tel:  (212) 545-4600
Fax: (212) 545-4653

Robert I. Harwood
Matthew M. Houston
Benjamin I. Sachs-Michaels
**HARWOOD FEFFER LLP**
488 Madison Avenue
New York, New York 10022
Tel:  (212) 935-7400
Fax:  (212) 753-3630

*Plaintiffs' Co-Lead Counsel*

Marvin A. Miller
Lori A. Fanning
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, Illinois 60603
Tel:  (312) 332-3400

*Plaintiffs' Liaison Counsel*

VINCENT L. DITOMMASO
PETER S. LUBIN
DITOMMASO LUBIN P.C.
17 W. 220 22nd Street – Suite 410
Oakbrook Terrace, Illinois  60181
(630) 333-0000

NICHOLAS I. PORRITT
LEVI & KORSINSKY, LLP
1101 30th St. NW, Suite 115
Washington, DC  20007
(202) 524-4293

*Attorneys for Rajeev Tipnis*

SETH D. RIGRODSKY
BRIAN D. LONG
GINA M. SERRA
RIGRODSKY & LONG, P.A.
919 North Market Street, Suite 980
Wilmington, Delaware 19801

KONSTANTINE KYROS
GEORGE PRESSLY
KYROS & PRESSLY LLP
60 State Street, Suite 700
Boston, Massachusetts 09102

*Attorneys for Christine Lutz*

FRANCIS A. BOTTINI
KEITH M. COCHRAN
CHAPIN FITZGERALD SULLIVAN &
  BOTTINI LLP
550 West C Street, Suite 2000
San Diego, California 92101
(619) 241-48110

*Attorneys for Chad Martin*

KEITH J. KEOGH
CRAIG SHAPIRO
TIMOTHY J. SOSTRIN
KEOGH LAW, LTD.
101 North Wacker Drive, Suite 605
Chicago, Illinois 60606
(312) 726-1092

KENNETH G. GILMAN
GILMAN LAW LLP
Beachway Professional Center Tower
3301 Bonita Beach Road, Suite 307
Bonita Springs, Florida 34134
(239) 221-8301

*Attorneys for Shawn Potter*

\694587

## <u>GROUPON, INC. VERIFICATION</u>

I, Theresa Monturano, hereby verify that I am familiar with the allegations in the Consolidated Shareholder Derivative Complaint, that I have authorized the filing of this complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: **7 - 30 - 2012**

_____

Theresa Monturano

# VERIFICATION

I, Kent Wong, hereby verify that I am a shareholder of Groupon, Inc. (the "Company"). I have reviewed the Verified Consolidated Shareholder Derivative Complaint (the "Complaint") and I authorize its filing. I have reviewed the allegations made in the Complaint and to those allegations to which I have personal knowledge, I believe those allegations to be true. As to those allegations to which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. I further declare that I acquired my shares of Groupon common stock in the initial public offering have continuously held the stock since that time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

7-24-2012
DATE

KENT WONG